No. 32,451

H. B. FULMER, *Appellee*, v. SKELLY OIL COMPANY, *Appellant*.

(53 P. 2d 825)

Opinion filed January 25, 1936.

*J. B. McKay, Ralph B. Ralston,* both of El Dorado, *Joseph G. Carey, George Stallwitz,* both of Wichita, and *Robert M. Turpin,* of Tulsa, Okla., for the appellant.

*C. L. Aikman,* of El Dorado, for the appellee.

The opinion of the court was delivered by

HUTCHISON, J.: This was an action by the owner of a quarter section of land in Butler county against a number of oil companies to recover permanent damages occasioned to his farm by reason of the pollution of Turkey creek, which runs through his farm and supplies it, its occupants and livestock with drinking water and other natural uses and benefits.

The petition alleges that the defendant companies have been engaged in drilling for and producing, marketing and storing oil and gas on land owned or leased by them and situated on the east side of Turkey creek and Cave Springs creek, a tributary of Turkey creek, about two or three miles above the land of the plaintiff. That the defendants while drilling oil and gas wells and operating them, and while marketing and storing oil and gas since about October, 1932, have wrongfully and purposely taken from such wells oil, gas, salt water and other refuse and poisonous substances and deposited them on the surface of the earth into slush ponds and into Turkey creek and its tributaries and have permitted the same to escape, run, flow and circulate wherever the lay of the ground would carry such, and large quantities of such poisonous substances so permitted to

escape did run and flow into Turkey creek and its tributaries and did thus go on, over and through the land of the plaintiff since October, 1932, and such will continue to pollute said creek and the land of the plaintiff as long as said leases are operated and oil and gas are produced thereon. That the water of the creek has been polluted and made unfit for use since October, 1932, and that trees on the premises have been killed and that it will be necessary to haul water and to keep the livestock away from the creek. By reason thereof the plaintiff alleges that this real estate has been permanently damaged, and he prays judgment therefor. This petition was filed May 8, 1934. .

The answer of the defendant was first a general denial and then it alleged:

". . . that if any cause of action ever accrued to plaintiff by reason of the allegations set forth in said petition, the same accrued more than two (2) years prior to the commencement of this action and therefore the same is barred by the statute of limitations in such cases made and provided, the same being section 60-306, paragraph number 3, Revised Statutes of Kansas."

In addition to oral testimony introduced, the testimony taken in a similar case brought by O. D. Sapp, owning land adjoining that of the plaintiff on the south, was by stipulation to be admissible, and parties also joined in submitting a very long stipulation as to the number and location of the wells drilled by each defendant company and the time when drilled and also the number abandoned.

The trial court made extended findings of fact and found in favor of the plaintiff for the recovery of $450 for permanent damages to the land and $50 for the loss of trees.

The defendants appeal, raising two questions: Does the record support the judgment for permanent injury to real estate, and was plaintiff's cause of action barred by the statute of limitations? Both parties accept the findings of the trial court.

There is a confusion involved in the discussion of the law of the case as to the damages being permanent or temporary, and also as to the liability for damages for pollution being dated from the permanent structure of the plants, which by common knowledge may be positively expected to cause pollution and damage, or from the date of the first serious injury from pollution. There may, too, be an injustice in dating the liability from a time prior to the causing of substantial injury. The trial court expressed in its findings an apparent doubt along these lines, but held that as a matter

of law whatever damages were here recoverable are permanent damages. This was certainly right, as the findings state that the tenant had previously been allowed damages for injury to crops, which were of course temporary damages and will not likely occur every year. But the fact, as found by the court, that the pollution may be greater one time than another does not make the damage to the land temporary. It is damaged, if at all, by that possibility of injurious pollution at any time depending, as the court finds, upon weather conditions, and particularly rainfall. There is another reason that, strictly speaking, eliminates this feature from the case entirely, and that is, the plaintiff in his petition has asked only for permanent damages. Therefore, the fluctuating casualties or change in weather conditions will not be a basis of right to recover, but at most could only be elements in estimating the amount of recovery. The court found there was permanent damage, and we think there was evidence sufficient to support such finding.

The other question raised by the defendants in their answer and their appeal is more serious. That is the bar of the two-year statute of limitations. The appellee cites the testimony of two or more witnesses who stated that there was no indication of oil, salt water or pollution on plaintiff's land until October, 1932, and that no damage was sustained thereon until that time. But the court finds that between 1917 and 1932 there were times when the water crossing plaintiff's land was polluted and its purity and quality substantially lessened from what it had been before the discovery of oil in that vicinity. The seventh finding of the court is general, and recites what those acquainted with the development of oil and the results connected therewith may and must reasonably expect.

The following are parts of finding No. 2, all of No. 4, a paragraph of No. 7 and all of No. 9:

"When the water in Turkey creek on plaintiff's land is flowing it will vary in width from a foot or two to thirty or forty feet, and at such times will vary in depth from an inch or more to five or six feet in the deeper pools. . . . Before Turkey creek was polluted by oil and salt water it furnished, on plaintiff's land, plenty of good water for all livestock kept thereon, but during dry periods it was sometimes necessary to change fences so that they could have access to the larger pools. . . .

"About 1917 oil was first discovered in the basin that is drained by Turkey creek and Cave Springs creek. The defendant companies, or their predecessors in title, drilled over 100 producing oil wells in this area. The time of drilling these wells was scattered out through the years from 1917 down to about 1929. Perhaps half of them were drilled as early as 1925. About sixteen wells were

abandoned before October, 1932, several since that time, and there were several other wells drilled which did not produce oil. . . .

"The defendant companies, since they began operating their respective leases, have at all times permitted some refuse oil, fresh oil and salt water to escape from their leases and into the creeks. That is not peculiar to these defendants or this oil field. It is true of every oil field. But again the conditions must be looked to to determine whether or not the water on the farm of a lower owner is damaged. . . .

"The court finds that there were times between 1917 and May 8, 1932, when the water in Turkey creek where it crosses plaintiff's land was polluted to some extent and its purity and quality substantially lessened from what it had been before the discovery of oil. How long this condition continued to exist at any one time depended upon the rainfall and other conditions suggested in these findings. During that same period there were times when the water on plaintiff's farm was substantially as good as it ever was, and suitable for farm and stock purposes. Also, while I am unable to find that it was always pure and wholesome during that period, yet livestock always drank it. Whether they failed to drink all they needed, or whether it was injurious to them, I am unable to determine. There was a stock pond on this land that was used some for watering livestock. In the late summer of 1933 there was water in the pond and the creek water was not needed. In the summer of 1934 the water in the creek on plaintiff's land was so polluted that livestock would not drink it and they had to be driven off the farm for water. This was the first time that the water in the creek could not be used at all for stock purposes. In the early part of 1934 the fish died, and ·this was the first time that this happened. The water was polluted in March, 1934, more than it ever was before or since. Beginning in the fall of 1933 about seventy-five trees growing along the banks died. At the time of the trial the creek water was being used for stock purposes and by reason of the many heavy rains in the fall of 1934 was substantially pure and wholesome, free from any substantial amount of pollution, and in as good condition as it had been at any time during the past four or five years.

"There is no doubt that there will be times hereafter when the water in this creek on the plaintiff's land will be again polluted and its purity substantially lessened from what it was before the discovery of oil. There is no doubt but what there will be times hereafter when said water will be substantially as pure as it ever was. As long as there is an oil field upstream from plaintiff's land these changes will take place, and whether this water at any particular time will be pure, partially polluted or wholly useless will all depend upon the conditions."

The court in effect finds that the water on plaintiff's land was polluted to some extent and its purity and quality substantially lessened from what it had been before the discovery of oil at times between 1917 and May 8, 1932, and that it was unable to find. from the evidence that the water in Turkey creek was always during that period pure and wholesome, although the stock drank it. Dur-

ing such years it was found necessary to change the fences so as to have access to larger pools for stock purposes, but in 1934 was the first time that the water in the creek could not be used at all for stock purposes, yet in part of that time after heavy rains in the fall it was substantially pure and wholesome, and the court concludes that as long as there is an oil well upstream from the plaintiff's land these changes will take place, and whether this water at any particular time will be pure, partially polluted or wholly useless will all depend upon conditions.

The question is, When did the permanent damage or injury to the real estate begin?

In the case of *McDaniel v. City of Cherryvale*, 91 Kan. 40, 136 Pac. 899, where the city of Cherryvale built a sewer system and discharged sewage into a creek, and an oil refinery drained waste water, acids, oil and other impurities into the same stream and polluted the waters to some extent from the very beginning, the extent of the pollution and injury depending upon the rainfall, it was held:

". . . that as the sewer system and refinery were, in their nature, design and use, permanent structures and their operation was necessarily a constant and continuous injury to the owner's land, his cause of action for permanent damages accrued when the sewage and impurities were first deposited in the stream, and not having been brought within two years from that time his action was barred." (Syl. ¶ 2.)

The case of *Lackey v. Prairie Oil & Gas Co.*, 132 Kan. 754, 297 Pac. 679, was commenced in 1929 by the owner of pasture land against several oil companies where the pollution began in 1925 and steadily increased as the number of wells increased to twelve or fourteen. They were permanent structures designed to continue indefinitely, and it was held:

"The proceedings considered in an action for damages for injury to pasture land resulting from pollution of a stream by oil, salt water, and refuse from oil wells, and *held,* the action was barred by the two-year statute of limitations." (Syl.)

The case of *Gardenhire v. Sinclair-Prairie Oil Co.*, 141 Kan. 865, 44 P. 2d 280, is fully distinguished from this case by the following extract from the opinion on page 869:

"While wells had been drilled in 1926, and some salt water had been discharged, but none that injured plaintiffs, it was well established that the salt water did not reach or injure plaintiffs until late in 1931 or the first months of 1932. When the wells were deepened salt water was developed in such quantities that the ponds provided did not care for it."

Another case in the same volume, *Martin v. Continental Oil Co.,* 141 Kan. 37, 39 P. 2d 917, was decided upon an answer to a special question being inconsistent with the general verdict, the action being for permanent injuries only by reason of pollution from oil wells.

Another decision in the same recent volume, *McMullen v. Jennings,* 141 Kan. 420, 41 P. 2d 753, while not an oil-well pollution case, involves the same principle as to permanent damages, being an action to recover damages on account of atmospheric pollution with dust from a grain elevator which commenced in 1928 with sixteen upright cylindrical concrete storage tubes or bins arranged in a double row with a frame gallery containing machinery for elevating the grain. Later twenty-four additional tubes were erected—all across the street from a row of dwellings, one of which belonged to the plaintiff, and it was held:

"Where such a nuisance as mentioned continues, the cause of action for damages arises when the first injury is inflicted. . . ."

"Where plaintiff's own evidence shows that the nuisance started with the first operation of the elevator and has since continued, varying only in degree as the operations covered the original plant with additions subsequently made thereto, the cause of action accrued as soon as it was determinable that there was nuisance as defined above, and not from the time the last additions were made to the plant." (Syl. ¶¶ 5, 6.)

The case of *K. P. Rly. Co. v. Mihlman,* 17 Kan. 224, is cited, and pertinent quotations are made therefrom, but the closing paragraph of the opinion states that several propositions are discussed only because they are raised in the briefs, and the conclusion reached does not differ from the rule announced in the foregoing citations as to the statute of limitations. The defendant railway company had in 1866 dug a ditch on plaintiff's farm without permission. It was to carry off water from the sloping land, and the company had inserted two culverts under the railroad connecting them with this ditch. Six years later, because these culverts and this ditch were unable to carry off all of the surface water, the plaintiff's land was flooded and his crops were destroyed, but the court held:

"Where A enters upon the land of B and digs a ditch thereon, there is a direct invasion of the rights of B, a completed trespass, and the cause of action for all injuries resulting therefrom commences to run at the time of the trespass. And the fact that A does not reënter B's land, and fill up the ditch, does not make him a continuous wrongdoer and liable to repeated actions as long as the ditch remains unfilled.

"After a wrong has been committed, it is the duty of the injured party to

make reasonable efforts to prevent an increase or extension of the injury, and if he fails to do so, he cannot recover for such increased injury." (Syl. ¶¶ 1, 5.)

Several cases are cited to support the view that the statute of limitations does not commence to run until the accrual of the cause of action or until damage has been sustained. Among them are the following: *Dixon v. Oil and Refining Co.*, 116 Kan. 465, 227 Pac. 325; *Beard v. Kansas City*, 96 Kan. 102, 150 Pac. 540; *Kinnard v. Stevens*, 122 Kan. 347, 251 Pac. 1085; and *Berry v. Shell Petroleum Co.*, 140 Kan. 94, 33 P. 2d 953.

In the Dixon case the statute of limitations was modified by the evidence of a contract made between the plaintiff and the oil company.

In the Beard case the action was against the city for damages caused by an overflow of water from a heavy rainfall, although the city had nine years earlier graded a certain street and bridged the creek. The court distinguished the facts in this case from those in the Cherryvale case, and the case of *Parker v. City of Atchison*, 58 Kan. 29, 48 Pac. 631, in which it was either assumed or proved "that the improvements made in and of themselves damaged the party complaining," and the court said in the opinion on page 105: "In the present case the improvements do no damage. The damage is caused by overflowing water." In the case at bar it was definitely found by the trial court that the water has been polluted since 1917 and will continue to be polluted to some extent as long as there is an oil field upstream. The damage here, although occurring mostly during droughts and times of low water, is by no means caused by the drought or low water.

The Kinnard case concerned the lien of a creditor on real estate prior to the obtaining of a judgment, and it was there held:

"The statute of limitations does not commence to run against a cause of action until the accrual thereof and the accrual of the cause of action means the right to institute and maintain an action for its enforcement." (Syl. ¶ 2.)

As stated there, the time under the statute commences from the time of the right to institute and maintain an action.

The Berry case was a recent oil-pollution case, and is cited only in reference to the holding made in the third paragraph of the syllabus, which is as follows:

"Proof that damage to real estate will exist for an indefinite time is ample to sustain a judgment for permanent damages." (Syl. ¶ 3.)

There is no dispute along that line in this case. The trial court, in the finding last above quoted, found the pollution is likely to continue as long as there is an oil field upstream.

We conclude that the cause of action of the plaintiff for the pollution of the water in the stream crossing his farm, resulting in permanent damages to his real estate, arose when the water in the stream on his farm first became polluted and not when drought or low water in the stream increased the seriousness of the pollution and the resultant damages.

The findings of the trial court show the pollution to have commenced in 1917 and therefore this action brought in 1934 is barred by the statute of limitations.

The judgment is reversed.