No. 32,749

C. J. SEGLEM (Revived in the Name of MELVIN SEGLEM, Administrator, Etc.) et al., *Appellees,* v. SKELLY OIL COMPANY et al., *Appellants.*

(65 P. 2d 553)

Opinion filed March 6, 1937.

*J. B. McKay, Ralph B. Ralston,* both of El Dorado, *Jos. G. Carey, George Stallwitz,* both of Wichita, and *Robert M. Turpin,* of Tulsa, Okla., for the appellants.

*C. L. Aikman,* of El Dorado, for the appellees.

*C. Glenn Morris,* of El Dorado, as *amicus curiae.*

The opinion of the court was delivered by

DAWSON, C. J.: This is another damage suit for the pollution of a stream caused by salt water and noxious refuse from an oil field.

Defendants are corporations which during the past twenty years have developed a considerable oil field bordering on Turkey creek and its tributaries in Butler county.

Plaintiffs are the owners of a farm which they inherited from their father, who died in 1931. It is situated on Turkey creek downstream from defendants' oil field, from which salt water, oil and noxious refuse have found their way into Turkey creek and its tributaries. In seasons of plenty of rainfall this discharge into the creek has done little or no damage, but in times of prolonged drought the water in the creek becomes unfit for domestic livestock to drink; poisonous and filthy sediment settles on the bottomland of the farm; and numbers of trees have been killed by the salt water and other harmful substances coming from defendant's oil wells. By these causes the value of the farm itself has been depleted.

This action was begun on September 26, 1934. Plaintiffs alleged the material facts. Defendants' answer contained a general denial and pleaded the statute of limitations.

The cause was tried before a jury on evidence adduced by the parties, together with a formal stipulation of facts which may require notice as we proceed.

Defendants' demurrer to the evidence was overruled; likewise their motion for a directed verdict.

The jury returned a general verdict for plaintiffs in the sum of $3,500, and answered special questions, some of which read:

"1. When was the first oil well completed upstream from the plaintiffs' land? A. 1917.

"2. Approximately how many oil wells had been completed upstream from the plaintiffs' land by January 1, 1930? A. 63.

"3. Were any oil wells drilled upstream from plaintiffs' land after January 1, 1930? A. No.

"4. Has oil, salt water or other refuse escaped, to some extent, from each of said wells at all times after its completion into the waters of Turkey creek or its tributaries? A. Yes.

"5. Did the plaintiffs, or any of them, at any time prior to the death of their father [in 1931], see any oil or other pollutive matter in Turkey creek on the land in question in sufficient quantities to mark the banks of the stream and the vegetation growing thereon? A. Yes.

"6. At all times since Turkey creek on plaintiffs' land has been to any extent polluted has the degree of such pollution been affected by seasonal conditions, as rainfall or lack of rainfall? A. Yes.

"7. What, if any, change has there been in the manner in which the defendants had handled the oil, salt water and other refuse from their said wells after January 1, 1930? A. Building salt-water ponds.

"9. If you find that plaintiffs' land depreciated in value, what act or acts, if any, of these defendants, or either of them, caused such depreciation? A. By the act of letting pollution escape into Turkey creek.

"10. What, if any, refuse from defendants' leases caused any damage to plaintiffs' land in or after October, 1932, which had not been present, to some extent, in Turkey creek on plaintiffs' land prior to said date? A. Salt water.

"11. When was the water in Turkey creek on the plaintiffs' land first damaged to a substantial degree from oil wells upstream therefrom? A. October, 1932."

The usual post-trial motions were filed and overruled. The trial court, with consent of plaintiffs, reduced the verdict to $2,800 and rendered judgment thereon.

Defendants appeal, contending chiefly that plaintiffs' own evidence clearly proved that their cause of action was barred by the two years' provision of the statute of limitations; and that the jury's special findings 4, 5 and 6 foreclose all controversy on that point.

It was the theory of the trial court that the cause of action did not accrue when the pollution from defendants' oil field first invaded Turkey creek and began to smear oil and other refuse over the bottomland of the Seglem farm; but that the cause of action arose only when the noxious materials began to cause "substantial" damage, which the jury found was in October, 1932 (Finding 11), and therefore this action, which was begun in September, 1934, was within the statutory time.

The adjective "substantial" is a familiar and convenient word used to appraise the sufficiency of evidence to withstand a demurrer or to sustain a verdict, in contradistinction to evidence which is too insubstantial, too attenuated, too shadowy to be the basis of an adjudication on controverted facts in litigation. In 4 Words and Phrases, 2d, Sec. 750, the word is defined thus:

" 'Substantial' means 'belonging to substance; actually existing; real; . . . not seeming or imaginary; not illusive; real; solid; true; veritable.' (*Elder v. State,* 50 South. 370, 374, 162 Ala. 41, citing Webst. Int. Dict.)"

Under this definition of "substantial," plaintiffs' own evidence was clear and incontrovertible that long prior to 1932, before the death

of their father in 1931, there had been an "actually existing" invasion of the rights of the farm owner caused by the wrongdoing of defendants; that such tortious acts or negligence of defendants were "real," "not seeming or imaginary," "not illusive," "true," "veritable.". One of the plaintiffs testified:

". . . A good many years ago I saw evidence of oil along the banks of the creek. Oil was on the water of the creek. It was before my father died. Long before he died. The creek was up and oil was coming down the creek. You could tell it was there, streaks of it. . . . I observed oil coming down the creek several years before my father died. . . . It has its origin in the oil field to the east. . . . I had seen oil along the sides on the brush and edges of the bank after the creek had been up. I observed it several times before my father's death. I noticed a streak of oil along the bank. It showed where there had been oil. This was about the time of my father's death or maybe before."

Another of plaintiffs testified:

"I have known at all times since the field came in above our place that if any pollutive matter would escape from those wells it would flow into Cave Springs creek and Turkey creek and through our farm. It couldn't go any place else. About 1921 when I first moved on the farm I noticed oil on the water. The water came up around the house and the barn and I had to fix some water gaps. While walking through the weeds oil would get on my trousers, and there was enough to get kinda nasty when I was around fixing the fence. I also observed the same condition on several occasions after 1921."

This testimony and much more which appears in the record abundantly supports findings 4, 5 and 6, which indeed are not attacked by either of the parties. Can it be said on the face of this testimony and findings 4, 5 and 6 which were responsive thereto that plaintiffs' father, as owner of this farm in his lifetime, could not have maintained exactly the same sort of action against these defendants for the pollution of Turkey creek and for consequent damage to his farm? It is not conceivable that any court would have denied him legal redress on the facts as adduced by plaintiffs and as found by the jury in this action. But by the same token it becomes apparent that the damage to the Seglem farm occurred more than two years prior to the bringing of this action. The fact that the damage to the farm may have been greater since 1932 on account of the unusual drought of that year, which decreased the average flow of water in the creek and consequently increased the relative percentage of salt water, oil and refuse in the stream is not a sound basis for a ruling that there was no "substantial" damage, no "real," no "actually existent" damage caused by defendants prior to that date.

A long list of familiar precedents govern this case, among which are: *McDaniel v. City of Cherryvale*, 91 Kan. 40, 136 Pac. 899; *Lackey v. Prairie Oil & Gas Co.*, 132 Kan. 754, 297 Pac. 679; *Mosby v. Manhattan Oil Co.*, 134 Kan. 732, 8 P. 2d 325; *Kiser v. Phillips Pipe Line Co.*, 141 Kan. 333, 41 P. 2d 1010; *Jeakins v. City of El Dorado*, 143 Kan. 206, 53 P. 2d 798; *Fulmer v. Skelly Oil Co.*, 143 Kan. 55, 53 P. 2d 825. See, also, *McMullen v. Jennings*, 141 Kan. 420, 41 P. 2d 753.

A careful examination of the other special findings of the jury and the evidence pertaining to them takes nothing from the legal effect which must be given to findings 4, 5 and 6. Thus, finding 7 says that since January 1, 1930, defendants' former method of handling oil, salt water and refuse from their oil wells has been changed, and that since 1930 the method has been "building salt-water ponds." Given its fair significance this finding indicates no actionable wrongdoing. And if it did, and has been going on since 1930, it would be barred as a cause of action prior to September, 1934, when this action was begun.

Noting next the finding No. 9, the depreciation in value of plaintiffs' land is specifically stated to have been the result of defendants' "act of letting pollution escape into Turkey creek." There was no evidence that letting the escape of such pollution was greater at any time after September, 1932, than it had been prior to that time; and indeed the fair significance of finding No. 7 compels the conclusion that it must have been less. The same observation must be made in respect to the answer to question 10:

"10. What, if any, refuse from defendants' leases caused any damage to plaintiffs' land in or after October, 1932, which had not been present, to some extent, in Turkey creek on plaintiffs' land prior to said date? A. Salt water."

This answer seems to be at variance with finding No. 7; but in any event the answer is either contrary to the evidence or altogether uncandid. Salt water had been present in Turkey creek prior to October, 1932, and the fact sought to be elicited by the question was that refuse was present in the creek afterwards which had not been present, to some extent, before that date.

At the onset we took note that this cause was tried in part on a stipulation of counsel. A somewhat surprising statement appears in appellees' brief. It is said:

"Appellees deny that they entered into any stipulation in this case. There was a stipulation in the Fulmer case, and an attempt made by the appellants

to have the attorney for appellees to stipulate in this case, but he refused to do so, and called the court's attention to the fact that he would not stipulate in this case."

On the contrary, the stipulation not only appears to the extent of five pages in the record, but in the instructions to the jury the substance of the stipulation was included without objection of plaintiffs. It reads:

"3. The defendants have each admitted by the stipulation read to you that they now and for several years last past, as set forth in said stipulation, have owned one or more oil leases in the watershed drained by Turkey creek and its tributaries; that they are now and for several years last past have been operating said oil leases and producing oil therefrom. They also admit that some oil and some salt water have escaped from their wells, tanks, ponds and pipe lines onto the surface of the ground included in their leases."

In their brief appellees urge this court to follow the early case of *K. P. Rly. Co. v. Mihlman,* 17 Kan. 224, "which has never been departed from until the *Fulmer opinion* [*Fulmer v. Skelly Oil Co.,* supra] *attempted to change the law.*" We cannot concede that the later cases of this court cited in this opinion have taken anything from the potency of the Mihlman case. The remark of counsel that this court's opinion in the Fulmer case "attempted to change the law" was unlawyerlike to say the least, no matter how strongly counsel may disagree with the court's decision. In the oral argument counsel admitted that his hope of sustaining this judgment was measurably predicated on the overruling of the Fulmer case. In our view many well-considered precedents of this court besides the Fulmer case would have to be overruled, and particularly those cited in this opinion, before this judgment could be permitted to stand. It should not be overlooked that this was an action for permanent damages to the farm, not for recurring damages, nor for the abatement of a recurring or continuing nuisance.

The judgment is reversed and the cause remanded with instructions to enter judgment for defendants.

ALLEN, J., dissenting.

HARVEY, J. (dissenting): Appellants no longer contend plaintiffs are not damaged in the amount of the judgment rendered in this case by salt water and other oil-well waste which they permitted to escape from their oil-well operations. The sole contention here is that plaintiffs did not bring their action in time. They say the action should have been brought when the oil-well operations began

several years ago in the region of the headwaters of the stream which runs through plaintiffs' land and several miles from it, or that the action should have been brought when there was the first showing in the stream on plaintiff's land of oil-well refuse which had escaped in the operation of oil wells near the headwaters of the stream. To my mind both contentions are fundamentally unsound. When the oil-well operations first commenced, several years ago, plaintiffs had no reason to think defendants would permit the escape of oil-well refuse which would be injurious to them. Had plaintiffs brought an action for damages at that time it would have been premature, and any claim of prospective damages would have been so speculative as not to have justified a recovery. So the action would have been futile. Had the action been brought after it was known by plaintiffs, sometime prior to December, 1931, that at times of high water there were traces of oil on the water enough to be seen on the banks of the stream, or upon weeds or brush where the stream had overflowed, but at a time when there had been no injury or damage to their land in any appreciable degree, it would have been premature for the reason that any anticipated damages to their land would have been too speculative to have formed the basis of a judgment in their behalf. In the somewhat similar case of *Gardenhire v. Sinclair-Prairie Oil Co.*, 141 Kan. 865, 44 P. 2d 280, it was held that the action did not accrue to plaintiffs until they were injured, and that the statute of limitations did not begin to run until that time. Also, in *Fulmer v. Skelly Oil Co.*, 143 Kan. 55, 53 P. 2d 825, the same rule was applied. There the trial court had made findings of fact. Among others was one that at times, more than two years before the action was brought, the water in the creek on plaintiff's land "was polluted to some extent and its purity and quality substantially lessened." This finding was the basis of the judgment of this court reversing the judgment of the trial court favorable to plaintiff. In both of these cases the test applied by the court was whether there had been any real or substantial injury to plaintiff's land more than two years prior to the time the action was brought. The same principle controlled our decision in *Lackey v. Prairie Oil & Gas Co.*, 132 Kan. 754, 297 Pac. 679. There plaintiff pleaded and proved actual damages to his land more than two years prior to bringing his action, and it was held he could not recover. To my mind that is a sound basis for determining when a cause of action

accrues and when the statute of limitations begins to run in an action such as this. Each of these cases cited many earlier decisions, and the rule applied in them is sustained both by reason and authority. It is true, as·set out in the opinion, one of the plaintiffs testified that prior to the death of his father in December, 1931, on several occasions after a freshet he had seen evidences of traces of oil upon the water of the creek. Answering question No. 5, the jury found that was true, but this is neither evidence nor a finding that plaintiffs' land was injured in any substantial or appreciable degree, or, indeed, injured at all by such slight traces of oil. The stipulation referred to in the court's instructions, set out in the opinion, is simply an admission on defendants' part that some oil and salt water had escaped from their wells, tanks, ponds and pipe lines into the surface of the ground included in their leases. I understand their leases did not cover the land of plaintiffs. This is not an admission by plaintiffs that the oil and salt water from defendants' operations had injured their land more than two years before this action was brought. Answering question No. 11, the jury found the water in the creek on plaintiffs' land was first damaged to a substantial degree from the oil wells upstream therefrom in October, 1932. If that is true this action was brought in time. Any controversy over that question arising in the evidence simply made a controverted question of fact. The jury has found the fact, and this finding has been approved by the trial court. I see nothing in the record which requires us to set it aside as a matter of law.

SMITH, J., joins in this dissent.