No. 36,613

GORDON PETERSON, *Appellee*, v. THE TEXAS COMPANY, *Appellant*.

(186 P. 2d 259)

C. A. SPENCER, judge. Opinion filed November 8, 1947.

*B. W. Griffith,* of Tulsa, argued the cause, and *Jerry E. Driscoll,* of Russell, was with him on the briefs for the appellant.

*Clifford R. Holland,* of Russell, argued the cause, and *George W. Holland* and *Herbert N. Holland,* both of Russell, were with him on the briefs for the appellee.

The opinion of the court was delivered by

SMITH, J.: This was an action for damages alleged to have been sustained by plaintiff when salt water and oil-field waste escaped from a pond maintained on an oil lease being operated by defendant on land adjoining land upon which plaintiff had a farm lease and conducted farming operations. Judgment was for plaintiff. Defendant appeals.

This action was commenced January 24, 1945. An action between the same parties for damages on account of salt water and oil-field waste and affecting the same real estate was commenced June 17, 1942, and judgment rendered in favor of plaintiff May 11, 1943. This judgment was paid and fully satisfied.

On account of an argument of *res adjudicata* and the statute of limitations, made by the defendant, attention will first be paid to the pleadings in each of these actions.

The action was first commenced June 17, 1942. The petition alleged that plaintiff was the agricultural tenant on a quarter section of described real estate which he used for farming and stock raising, which was well improved with a two-story house, with full basement, barn, granary, chicken house and tool shed; that there were two wells upon the place which furnished, until about November 1, 1941, a never-failing supply of wholesome water ample for all farm purposes; that prior to May 1, 1941, the house was surrounded by about sixty shade trees.

The petition then alleged the defendant was the owner of an oil-and-gas lease upon a described quarter section of land which it was operating and was producing oil and gas; that this lease was immediately north of and adjacent to plaintiff's land, and that defendant had damaged plaintiff's rights of possession and occupancy in that the leaseholds of defendant were upstream or above the fresh-water strata upon plaintiff's land and defendant by its operations was producing large quantities of crude oil, base sediment salt, salt water and water containing minerals, all of which were injurious to human life; that in the operation of these wells defendant maintained salt-water ponds, into which it drained its salt water and other minerals; that beginning about May 1, 1941, defendant permitted its salt water to escape and flow from its wells into the fresh-water strata lying underneath the entire premises occupied by plaintiff so that his land and the fresh water under it had become impregnated and saturated with crude oil, base sediment, salt water and water containing minerals; that these substances had thereby destroyed vegetation and made the soil unproductive and incapable of sustaining any plant life; that the wells had been so polluted that plaintiff had been unable since December, 1941, to use the water therefrom for any purpose; that in addition the salt water had escaped into the basement of plaintiff's house so that plaintiff had been compelled to go to expense in pumping it from the basement and it had prevented plaintiff from using the basement and had weakened the foundation of the house.

Subsequently an amended petition was filed which made everything already referred to a part and alleged in addition that the salt water flooding the basement had damaged and ruined certain described property; had an unpleasant odor which permeated the house and made living in it uncomfortable and difficult; that the pollution

had damaged the health of plaintiff's cattle so that he had been compelled to expend money for veterinaries' services and medicine and to abandon his pasture for the summer and fall of 1941 and the spring of 1942 and rent other pasture; that during the summer and fall of 1941, and early spring of 1942, this pollution caused the loss of eight dozen chickens by reason of drinking this water; that this pollution caused them to lay fewer eggs and plaintiff lost about 1,150 dozen eggs; that the pollution had destroyed all the trees and shrubbery and destroyed the fertility of the soil for farming purposes; that plaintiff had been compelled since May 1, 1941, to haul water for his family and stock. The amended petition then alleged that on account of the pleaded acts of defendant he had been damaged as follows:

"For work and labor and the use of plaintiff's tractor from May 1st, 1941, to June 17, 1942, in pumping and draining said basement, 412 days at $5.00 per day .................................... $2,060.00
Loss of use of basement and furnace ............................. 400.00
Loss of plaintiff's personal property in basement of house, as follows:
   Destruction of cream separator ............................. 75.00
   Destruction of cook stove .................................. 25.00
   Destruction of folding cots or beds ........................ 25.00
Loss of use and enjoyment of living quarters, which includes loss of shade, damage from obnoxious odors, carrying coal, etc ....... 500.00
Loss of cattle .................................................. 400.00
Loss of use of pasture and rent for other pasture land ............. 165.00
Loss suffered by reason of hauling water ......................... 475.00
Loss of money paid out for drugs and veterinary fees ............. 25.00
Loss from death of chickens ..................................... 75.00
Loss of eggs from chickens ...................................... 275.00

In the total amount of ....................................... $4,500.00"

The amended petition then alleged that all the acts of defendant had been continuous since about May 1, 1941, and that these acts would continue to cause damage to plaintiff, and the defendant should be enjoined from allowing the waste material to escape.

The prayer was for judgment for $4,500 damages and an injunction.

After the issues were made but before trial defendant confessed judgment in the amount of $1,200 and judgment was entered accordingly on May 11, 1943.

We shall now notice the pleadings in the case at bar. The peti-

tion first set out the location of the real estate and the relationship of the parties as in the former action; the location of the house, out-buildings and two wells and that in addition that there was a cistern which provided a never-failing source of wholesome water; that defendant was the owner of an oil lease on a described quarter section and from June 17, 1942, down to July 1, 1943, produced oil from these leases immediately north of plaintiff's farm and injured plaintiff's right of occupancy because from June 17, 1942, to July 31, 1943, the leaseholds of defendant were above the fresh-water strata of plaintiff's land and defendant was producing large quantities of crude oil, base sediment, salt and salt water containing minerals which were injurious to vegetation and mineral life; that in the process of operating these leases defendant had constructed salt-water ponds and disposal wells into which it drained its salt water, etc.; that in operating these wells defendant had permitted its salt water to escape into the fresh-water strata lying underneath the entire premises of plaintiff and into draws which ran from the leasehold of defendant upon plaintiff's farm so that the fresh water under plaintiff's land had become saturated with salt water, which had destroyed vegetation and crops and made the soil unproductive and incapable of sustaining any vegetation; that the wells became so polluted that plaintiff has been unable to use water from them since June 17, 1942; that in addition the cistern became polluted so that from June 17, 1942, up to July 1, 1943, plaintiff was compelled to go to great expense in rebuilding it; that salt water escaped into the basement of plaintiff's house causing him trouble and expense because the odor of the water caused the walls of the house and the clothing and furniture of plaintiff to deteriorate and rot; plaintiff was compelled to go to great expense in pumping this water from the basement; that the house became difficult to heat because the furnace was in the basement and he lost the use of it; that the pollution caused his cattle and poultry to become sick and plaintiff was compelled to expend money for a veterinarian and for medicine; that it caused the death of a two-year-old heifer and four dozen chickens, twenty-five head of cattle lost weight; kept eight dozen chickens from laying and deprived plaintiff of the income from the sale of about 250 dozen eggs; that the pollution killed two or three acres of grass; that in addition to the other matters alleged plaintiff was compelled to haul water from June 17, 1942, to July 1, 1943. Damages were set out as follows:

"For work and labor of plaintiff and use of plaintiff's tractor from July 17, 1942, to July 1, 1943, in draining and pumping said basement 378 days at $4.00 per day.............................. $1,512.00

Loss of use of basement and furnace from June 17, 1942, to July 1, 1943 ...................................................... 100.00

Loss of use and enjoyment of living quarters, which includes loss of shade, damage from obnoxious odors, carrying coal, etc........... 100.00

Loss of cattle by death........................................ 100.00

Damage to 25 head of plaintiff's cattle, caused by shrinkage from June 17, 1942, to July 1, 1943.................................. 250.00

Loss of use of pasture......................................... 100.00

Damage suffered by reason of hauling water from June 17, 1942, to July 1, 1943, 378 days at $1.50 per day........................ 567.00

Loss of money paid out for drugs and veterinary fee................ 5.00

Loss from death of chickens, 4 dozen, from June 17, 1942, to July 1, 1943 ...................................................... 50.00

Loss of 250 dozen eggs, at 40 cents.............................. 100.00

Damages and labor incurred in repair of cistern.................... 100.00

    Total damages ............................................. $2,984.00"

Judgment was asked for $2,984.

The demurrer of defendant to the petition was overruled.

The answer of defendant first denied that it had injured plaintiff in any way and alleged that if plaintiff had sustained any damages they were the result of the natural condition of the land of plaintiff and the waters in it; that if plaintiff sustained any damage from salt water it escaped from wells on his own land; that defendant had operated its lease in a careful manner and had at all times maintained reasonable and proper dams and reservoirs and had not been guilty of any negligence; that if plaintiff suffered any of the damages of which he complained then his own negligence contributed thereto because if plaintiff's water was polluted and his cattle drank it plaintiff knew of it and permitted his stock to drink the water; that if plaintiff sustained any damages they were not sustained within the period of two years before the bringing of the action and the action was barred.

For a second defense the answer referred to the former action, the petition to which is set out here, and made a part of the answer; alleged that judgment in that action was entered for $1,200; that the parties were the same and that the plaintiff in the former case alleged the permanent damages he was claiming in this action and that the issues in the present action had been finally adjudicated in the former action and plaintiff was barred by reason of this adjudication from maintaining the present action.

In his reply after a general denial the plaintiff admitted the filing of the former action but alleged that he had sought to recover in it only such damages as he had sustained up to the time of his filing it.

With the issues thus made the defendant filed a motion to determine issues of law in advance of the trial. In this motion he set out the pleadings in the two actions about as they have been detailed here and asked the trial court to hold that the adjudication in the former action was *res adjudicata* of the issues pleaded in this one and that the pleadings in the two cases established that plaintiff had knowledge of the facts pleaded in this action more than two years before it was begun, hence it was barred by the two-year statute of limitations. At the same time defendant filed a motion for judgment on the pleadings which raised the same law points. These motions were both overruled.

At the trial of the action at the end of plaintiff's case defendant demurred to it on the ground that it failed to prove any cause of action against defendant. This was denied and when finally submitted the jury returned a verdict in favor of plaintiff in the amount of $1,975. Special questions were answered as follows:

"1. Do you find from the evidence that salt water entered the basement of the residence upon said leased premises between the dates of June 17, 1942, and July 1, 1943? A. Yes.

"2. If you answer question No. 1 'Yes,' then do you find from the evidence that a portion of such water was natural surface or underground water as distinguished from salt water, which became mixed with salt water, diluting or weakening the strength of same. A. Yes.

"3. If you answer question No. 2 'Yes,' then do you find, from the evidence, that during certain seasons of the year, most of the water which entered plaintiff's basement would have entered same regardless of whether or not any salt water from an oil well or wells was mixed with same? A. No.

"4. Was plaintiff the sole or absolute owner of the chickens and eggs for which he, plaintiff, claims damages in this case? A. Yes.

"5. Did plaintiff learn and know at any time prior to June 17, 1942, that the water in the pond of said leased premises was damaged or injured by reason of salt water? A. Yes.

"6. Did plaintiff learn or know, prior to June 17, 1942, that the drinking of such water by his livestock or chickens upon said leased premises would prove injurious? A. Yes.

"7. If you answer question No. 6 'Yes,' then do you find that after plaintiff learned it would be injurious to his livestock or chickens to drink the water upon his leased premises, he permitted them to drink such water? A. Yes.

"8. Do you find that plaintiff's livestock or chickens, or both were injured or damaged by drinking water from plaintiff's pond or draw on said leased premises subsequent or after plaintiff knew or learned that such water was injurious to livestock or chickens? A. Yes.

"9. What, if anything, do you find plaintiff did to prevent his livestock or chickens from drinking such water after plaintiff knew that such water would prove injurious to them? A. Given access to fresh water from Braden-McClure water well and Sam Boxberger water well.

"10. Do you find from the evidence that plaintiff could by the use of reasonable diligence or ordinary care, have prevented his stock and chickens from drinking such water, and thereby avoid injury or damage to them. A. No.

"11. Do you find from the evidence that the plaintiff knew, prior to June 17, 1942, that the water on said leased premises was polluted, and that the drinking of same by his livestock or chickens, if permitted to drink same, would prove injurious? A. Yes.

"12. Could the plaintiff, with reasonable diligence and expense, have fenced his pond in the pasture on said leased premises, and thereby prevent his livestock from drinking the water therefrom? A. No. No fence material available.

"13. Do you find from the evidence that the plaintiff pumped salt water from his basement, and permitted it to flow into, or enter, his pond on said leased premises? A. Yes.

"14. If you answer question No. 13 'Yes,' then state if the plaintiff knew that his livestock would drink such water and would be injured thereby. A. Yes. No other means of disposal."

The defendant filed a motion for a new trial setting out some twenty-two grounds therefor, also motion for a new trial on the ground of inconsistency between the general verdict and the answers to special questions, a motion to strike the answers to special questions 3, 9, 10, 12 and 14, and a motion for judgment notwithstanding the verdict. These motions were all overruled and judgment entered pursuant to the verdict—hence this appeal.

Defendant argues first that judgment should have been entered in its favor on its motion to determine issues of law and its motion for judgment on the pleadings because it is clear from all the pleadings, including those in the former case, that the matter upon which the plaintiff depends to recover in this case was *res adjudicata* and also was barred by the statute of limitations.

Because defendant so presents the matter in its brief we shall deal with the argument of the statute of limitations.

To sustain its argument on this question, defendant cites and relies on *McDaniel v. City of Cherryvale*, 91 Kan. 40, 136 Pac. 899; *Lackey v. Prairie Oil & Gas Co.*, 132 Kan. 754, 297 Pac. 679; *Fulmer v. Skelly Oil Co.*, 143 Kan. 55, 53 P. 2d 825; *Waidlick v. City of Manhattan*, 150 Kan. 34, 90 P. 2d 1104; and *Eyman v. National Union Oil & Gas Co.*, 153 Kan. 45, 109 P. 2d 477.

There can be no doubt but that plaintiff did have knowledge as early as 1941 that oil-field refuse from defendant's wells was flow-

ing onto his farm in a substantial amount. The authorities cited above, however, all deal with situations where plaintiff was asking for damages to his real estate as distinguished from damages to growing crops, cattle and other personal property.

It will be remembered that with the exception of an item of $100 for "loss of use of living quarters, which includes loss of shade, damage from obnoxious odors, carrying coal, etc." the damages for which plaintiff asked a judgment in this action were all of a temporary nature, such as loss of cattle, loss of chickens and eggs, expenses in pumping water out of basement, etc. It should be noted here that when ruling on the motion for judgment on the pleadings the trial court announced that no recovery would be allowed for the loss of trees because that was an item of permanent damage.

Defendant while not directly admitting it indirectly concedes that the items of damages for which plaintiff asked were temporary in their nature. Its argument to meet this may be stated that plaintiff alleged permanent damages to the real estate; that when he did that he made his action one for permanent damages and he could not thereafter be heard to say that the action was for temporary damages or damages to personal property only, even though he actually by setting out the items asked for temporary damages only. Upon the answer to that question lies the answer to the argument of defendant on the matter of the statute of limitations.

Defendant says "Plaintiff elected to treat the injury as permanent in character, and brought suit to recover, and did recover on that basis."

We cannot give the language in the petition upon which plaintiff relies quite the construction and weight defendant contends it should be given. *McDaniel v. City of Cherryvale,* supra, was an action by a farmer to recover damages to his farm on account of sewage the city had permitted to escape from its sewage disposal plant and flow into a stream that ran through plaintiff's farm. This court held that the statute had run against his right to recover for damages to his real estate, but said:

"He could have elected to have sued for temporary damages sustained within the statutory period preceding the bringing of the action, and for any subsequent injury or loss an additional action might have been brought. He chose, however, to treat the injury as permanent in character and brought a single action to recover for all present and prospective damages to his land." (p. 43.)

It would be difficult to state a case where the plaintiff more clearly evinced a determination to elect to sue for temporary damages than we have here. The allegation in the petition which defendant argues made this an action for damages to the real estate were incidental merely to the statement of the items for personal damages for which plaintiff actually asked to be given judgment. In considering a question such as this we shall examine and consider the entire petition, not merely a paragraph of it.

In *McDaniel v. City of Cherryvale*, supra, we state "This was an action to recover permanent injuries to the plaintiff's land."

In *Lackey v. Prairie Oil & Gas Co.*, supra, we said:

"The petition pleaded injury to the freehold. Things severable from the soil and capable of suffering independent injury considered apart from the soil, were not mentioned, such as prairie hay, cultivated crops, or other products classifiable either as fructus naturales or fructus industriales. Nothing was involved but the land in its natural state—soil, grass attached to the soil by roots, and flowing water." (p. 755.)

In *Fulmer v. Skelly Oil Co.*, supra, we said:

"This was an action by the owner of a quarter section of land in Butler county against a number of oil companies to recover permanent damages occasioned to his farm by reason of the pollution of Turkey creek, which runs through his farm and supplies it, its occupants and livestock with drinking water and other natural uses and benefits." (p. 55.)

*Waidlick v. City of Manhattan*, supra, was an action for damages to property alleged to have been incurred when a dump maintained by the city caused the current to be deflected and on an occasion of high water the plaintiff's land to be flooded. In the course of the opinion we said:

"It must be noted that in the instant case the plaintiff sought not only damages for what might be called immediate losses, but also for permanent injury to the land." (p. 37.)

In *Eyman v. National Union Oil & Gas Co.*, supra, we said:

"Under the issues as framed by the pleadings the action was for permanent damages. But assuming the action was for the loss of the trees apart from the damage to the real estate, the plaintiff would not be in a more favorable situation. The cause of action accrued upon the death or destruction of the trees, and that was more than two years before the action was begun." (p. 48.)

No authority is cited by the defendant nor have we found one where it was held that an incidental allegation that would have sustained a judgment for permanent damages caused the action to be one for permanent damages regardless of the fact that the plaintiff

asked for temporary damages only and the issues were made and the case was tried and submitted to the jury on the theory of temporary damages. Plaintiff could not bring an action for damages on account of the death of the heifer until she was killed. He brought this action within less than two years after her death and hence it was brought in time and was not barred by the statute of limitations. The same statement may be made as to the other items.

We shall next consider the argument of defendant that it was entitled to judgment on its motion to decide issues of law in advance of the trial because it was clear from the pleadings in the two cases that the matter upon which the defendant depended to recover in this action was *res adjudicata* on account of the judgment in the former action.

Here defendant points out the allegations in the petition in the former case that the salt water from defendant's lease permeated the soil so as to render it unproductive and incapable of sustaining any vegetation and plant life. It then argues that since such an allegation, if proven, would have sustained a judgment for permanent damages, that the plaintiff was bound to ask in that action for all damages, past, present, prospective, temporary, and permanent that he ever expected to claim from defendant. The rule of law upon which the defendant relies to sustain this position is that a judgment is final as to all matters that were or properly should have been litigated under the facts constituting the cause of action. It argues that since under the allegations of the petition in the former action the plaintiff could have litigated his right to recover damages, both permanent and temporary, then the final judgment in that action ended the right of plaintiff to recover any damages at all from defendant on account of salt water escaping from this particular lease. Defendant concedes that plaintiff will argue that in the former case his claims were for stock loss, for loss of chickens and eggs, for hauling water, and for pumping water out of his basement and that these constitute claims of damages temporary in their nature. Defendant argues, however, that this does not meet the proposition that the cause of action was permanent in its nature on account of the allegation to which reference has just been made. This is but another way of stating the argument of defendant on the question of the statute of limitations. Defendant, first to sustain the rule that allegations and statements of a party contained

in his pleadings are binding and conclusive upon him, cites *Linn v. Ziegler*, 68 Kan. 528, 75 Pac. 489, and *Johnston v. Winfield Town Co.*, 14 Kan. 390, and to sustain the rule a party is bound by the solemn declarations in his pleadings and will not be permitted later in the same case or in a subsequent one between the same parties to take a position contradictory to or inconsistent with such pleadings cites *Bonesteel v. White*, 127 Kan. 843, 275 Pac. 163.

These authorities correctly state the rule contended for. They are not, however, in point here. The question with which we are concerned is whether the allegations of permanent damages in the petition to which reference has been made caused the action to be one for damages to the real estate regardless of the allegations of the balance of the petition and the items of damages actually prayed for.

To sustain its position on this point defendant cites *Clemons v. Kansas Gas & Electric Co.*, 131 Kan. 93, 289 Pac. 461. In that case the plaintiff asked damages to land and growing crops on account of a stream overflowing. The plaintiff had previously brought an action for flooding and had alleged damages of a permanent nature and had recovered. Among the items asked in the second action were damages for crops.

The contention of the plaintiff in the second cause of action was that because the trial court in the first action had instructed the jury that future or prospective damages could not be recovered he could recover such damages in the second suit. This court held that since the first action was brought on the theory of a permanent injury the recovery under that cause of action precluded a later recovery even for subsequently accruing damages even though the trial court in the first case had erroneously excluded such prospective damages from the consideration of the jury.

The opinion does not sustain the argument of the defendant here because, as stated, the first action was brought to recover permanent damages. Here, as we have heretofore demonstrated, the first action was actually brought to recover temporary damages or damage to personal property.

We conclude that the trial court ruled correctly when passing on the motion of defendant to decide questions of law in advance of the trial court and in denying its motion for judgment on the pleadings.

Defendant next argues that plaintiff was not entitled to damages for pumping water out of the basement. In its brief here it presents

its argument on this point under two heads: First, defendant was not responsible for damages which would have been sustained apart from its own acts. Second, the pumping of water from the basement was not a reasonable charge or expenditure under the doctrine of unavoidable consequences.

At the outset of our consideration of this argument it is wise to state that the plaintiff asked, altogether, for $2,984. The item for pumping water from the basement was $1,512. That left $1,372 for the other items. The verdict of the jury was for $1,975. The defendant did not submit any questions to the jury as to how much it allowed plaintiff for any one item. Assuming that the jury allowed the full amount asked for the other items all we can be sure it allowed for pumping water is $603. Defendant's argument will be considered with this fact in mind.

Defendant points out the water in plaintiff's basement tested only 6,000 parts of salt water per million while the water from its salt-water pond tested 52,000 p. p. m. From this it argues that the water from its pond must have mixed with fresh surface water so that 8/9 of the water that got into plaintiff's basement was underground fresh water that would have entered plaintiff's basement had defendant never had any salt-water pond. It is not quite clear just how defendant raised this question in the court below since the jury was not asked to state just how much it allowed for each item. Defendant did file a motion to strike the answers to various special questions. No particular point is made in its brief here of the action of the trial court in overruling these motions.

The first argument of defendant on the point that plaintiff was not entitled to damages for pumping water out of his basement is really an attempt to induce this court to weigh conflicting testimony and to consider certain proven facts and certain conceded ones and reach a different conclusion than was reached by the trial court. The testimony of the two experts, to which defendant refers, was only a part of the testimony in the record. There was other substantial testimony to sustain the answers of the jury to special questions and the general verdict. Not the least persuasive of this testimony was the fact testified to by officers of defendant, as well as by plaintiff and his wife, that when the oil wells were shut down and did not pump any salt water and after the salt-water disposal well was used, the water stopped coming into plaintiff's basement and it was dry.

In connection with its argument on this point defendant points to the answers to special questions as follows:

"1. Do you find from the evidence that salt water entered the basement of the residence upon said leased premises between the dates of June 17, 1942, and July 1, 1943? A. Yes.

"2. If you answer question No. 1 'Yes,' then do you find from the evidence that a portion of such water was natural surface or underground water as distinguished from salt water, which became mixed with salt water, diluting or weakening the strength of same. A. Yes."

Defendant finds no fault with the answers to questions 1 and 2 but argues that the answer to question 3 is unsupported by and contradictory to all the substantial evidence. Defendant is referring in that argument to the testimony of the two experts which has been heretofore set out. When we consider all the evidence, however, we conclude there was substantial evidence to sustain this answer.

We shall now consider the argument of defendant that the pumping of water from the basement was not a reasonable charge under the doctrine of unavoidable consequences. Defendant states the rule to be that in order to enable plaintiff to recover for expenses incurred in seeking to lessen damages under the doctrine of unavoidable consequences these expenditures must be reasonable in amount, must be justified under the circumstances and must be calculated to reduce rather than enhance the total damages. In this connection defendant makes the rather ingenious argument that since plaintiff pumped the water out of the basement every day for considerably over a year and it ran in again each night then he should not have pumped it out every day but should have let it stay there and thus have avoided the expense of pumping it out. This argument overlooks the fact that plaintiff was living in the house at the time and the water in the basement was a constant source of annoyance to him and his family. He had a right to lessen that annoyance by any reasonable expenditure. In this connection defendant points out its requested instruction and argues it was error for the trial court to refuse to give it. That instruction was as follows:

"INSTRUCTION No. 15

"The court instructs the jury that if you find, under the evidence, that the pumping of water from the plaintiff's basement, and the incurring of expenses in connection therewith, did not lessen or mitigate the damages, if any, and that such expenses, if any were out of all proportion to the damages, if any, sought to be avoided, and if you further find, under the evidence, that the plaintiff knew this, or should have known it, as a reasonably prudent person,

then the plaintiff is not entitled to recover of and from the defendant for the expenses, if any, of pumping water from said basement."

There was no evidence at all from which a reasonable inference could be drawn that this pumping did not mitigate plaintiff's damages. The court did not err in refusing to give this instruction.

Defendant next argues that plaintiff was not entitled to recover for damages resulting from his own acts or contributory negligence. On this point defendant points out that plaintiff himself testified that he pumped the salt water from his basement into a draw that ran down and emptied into his own stock pond from which his own cattle drank and were damaged.

In this connection defendant points out the answers to questions 5, 6, 7, and 8. Those questions and answers are as follows:

"5. Did plaintiff learn and know at any time prior to June 17, 1942, that the water in the pond of said leased premises was damaged or injured by reason of salt water? A. Yes.

"6. Did plaintiff learn or know, prior to June 17, 1942, that the drinking of such water by his livestock or chickens upon said leased premises would prove injurious? A. Yes.

"7. If you answer question No. 6 'Yes,' then do you find that after plaintiff learned it would be injurious to his livestock or chickens to drink the water upon his leased premises, he permitted them to drink such water? A. Yes.

"8. Do you find that plaintiff's livestock or chickens, or both were injured or damaged by drinking water from plaintiff's pond or draw on said leased premises subsequent or after plaintiff knew or learned that such water was injurious to livestock or chickens? A. Yes."

Defendant argues that the act of plaintiff in permitting his livestock and chickens to drink water which he knew would prove injurious constituted contributory negligence, which precluded his recovery for damages resulting therefrom. The record discloses that at times the pond did not test to a high enough degree of chlorides to harm his stock and that plaintiff hauled water and ran a pipe line to a tank in the pasture in an effort to prevent his livestock and chickens from drinking water from the pond.

Defendant requested that the trial court give an instruction, as follows:

"REQUESTED INSTRUCTION No. 13

"It is a rule of law in this state that plaintiff may only recover for the natural and direct consequences of the wrongful acts, if any, of the defendant—but may not recover the consequential damage which might have been avoided by ordinary care on his part.

"Therefore, in this case, if you find from the evidence that plaintiff's live-

stock or chickens, or both, were injured or died, and that such injury or death was occasioned by, or the result of, plaintiff's own carelessness in allowing or permitting his livestock and chickens to drink such water on said leased premises after plaintiff knew such water was unfit for such use, then plaintiff would be precluded from recovering against the defendant in this case for such damages, if any."

We have concluded that the instructions given substantially covered the legal points covered by this requested instruction.

Defendant next argues that plaintiff could not recover damages for the loss of chickens and eggs because the testimony in the case shows that plaintiff's wife was the joint owner of the chickens and eggs. The petition alleged damages of $100 for the loss of chickens and $100 for loss of eggs.

As has been pointed out, no one knows just how much of this verdict, if any of it, was for loss of the chickens and eggs. Furthermore, this court would have to be wiser than Solomon to say when a man and wife are living together on a farm and operating it as a family enterprise who owned the chickens.

The judgment of the trial court is affirmed.

THIELE and WEDELL, JJ., concur in the result.