Cecil W. MILLER and Mildred E. Miller, Joint Tenants; Margaret L. Birchenough Testamentary Trust, Donald L. Birchenough, Ansel Tobias and Walter Wright, Trustees; Ruth M. Hollinger, Individually and as Joint Tenant with Delbert Hollinger; John E. Edwards and Kermit C. Edwards, Joint Tenants; Homer Sharpe; Cecil M. Tobias and Frances Tobias, Joint Tenants; Paul F. Westrup and Ardis B. Westrup, Joint Tenants; Jay Brothers; Lyle Brothers, Individually and as Joint Tenant with Patricia R. Brothers; Alvin Engelland; Ansel Engelland; Jack Engelland and Vivian M. Engelland, Joint Tenants; Gerald N. Jones and Donna Jones, Joint Tenants; Robert A. Johannsen; Raymond E. Tobias; Gary Zwick; Lester Colle; Harvey Willhaus and Marilyn Willhaus, Joint Tenants; Wilmor H. Oden; Raphael Roeder and Annabelle A. Roeder, Joint Tenants; Edris Edwards; Edward F. Janda and Anna Mae Janda, Joint Tenants; Harry Zwick; Arthur H. Oden; Joleen J. Ottlinger; and William L. Bemis and Dorothy Bemis, Joint Tenants; Plaintiffs,

v.

CUDAHY COMPANY, a Delaware Corporation, and General Host Corporation, a New York Corporation, Defendants.

Civ. A. No. 77–1212.

United States District Court, D. Kansas.

June 21, 1983.

Deborah Carney and Hal Meltzer, Turner & Boisseau, Chartered, Great Bend, Kan., for plaintiffs.

Thomas Kitch and Ron Campbell, Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for defendants.

## OPINION AND ORDER

THEIS, Senior District Judge.

This saltwater pollution case, which has been bogged down in an extraordinarily contentious discovery phase for nearly six years, is currently before the Court on the plaintiffs' motion for review of an order filed in this case by United States Magistrate John B. Wooley, and on the defendants' motion for partial summary judgment. These two motions, fairly routine in other cases, have been pending for some time because of the avalanche of paperwork accompanying them. The corpulent documents pertinent to these motions comprise nearly four hundred and fifty pages, and are accompanied by three unpaginated bound volumes of appendices numbering over one hundred. Giving these documents, and the arguments made in them, the consideration to which they are due has been a time-consuming adventure for the Court, and has generated an Opinion substantially longer than the ideal. The task has nevertheless been completed, and, for the reasons that follow, the Court must deny both the plaintiffs' motion and the majority of the defendants' motion.

### A. Brief Factual Background

The very numerous plaintiffs in the present lawsuit are owners and lessees of realty in Rice County, Kansas. To the northwest of this realty is the manufacturing plant of the American Salt Company [American Salt]. American Salt is a division of the defendant Cudahy Company [Cudahy], a Delaware corporation with its principal place of business in Arizona. Cudahy is, in turn, a wholly-owned subsidiary of the defendant General Host Corporation, a New York corporation with its principal place of business in Connecticut. For convenience, the defendants will hereafter be collectively referred to as American Salt. American Salt is engaged in the business of producing salt and salt products, and this business has been carried on continuously at American Salt's present location since 1908.

The natural salt formation exploited by American Salt lies approximately 725 feet below the ground surface in a stratum 280 feet thick. Two methods are used to bring this salt to the surface. The first method utilizes a shaft mine and involves physically removing solid salt to the surface. The second method utilizes a matrix of brine wells and involves dissolving the salt in injected high pressure water, retrieving the saturated liquid brine at the surface, and evaporating the brine to leave solid salt. This latter method is called solution mining and is the only one pertinent to the issues in this lawsuit.

The water required by the solution mining process is obtained by American Salt from a natural aquifer that underlies the area at a depth of thirty to sixty feet. The aquifer flows in a southeasterly direction, and consequently passes under the lands owned or leased by the plaintiffs after it has passed under the lands occupied by American Salt and its solution mining field. As the existence of this lawsuit suggests, the aquifer has become heavily polluted with salt and can be used neither for irrigation nor for domestic purposes over a large area southeast of American Salt's plant. Salt concentrations approaching 30,000 parts per million [p.p.m.] have been recorded in water drawn from this aquifer. The gravity of these concentrations can best be appreciated when it is realized that concen-

trations as low as 250 p.p.m. are sufficient to make water taste salty and to render it unfit for domestic use. Saturated brine, that is, water holding in solution the maximum amount of salt possible, has a salt concentration of approximately 165,000 p.p.m.

The contentions of the parties are outlined in the Pre-Trial Order, Dk. No. 309, which was filed on March 9, 1982 and supercedes the pleadings in the case pursuant to Rule 16 of the Federal Rules of Civil Procedure. The plaintiffs essentially lay the blame for the saltwater pollution of the aquifer on American Salt, allege "that the defendants' actions constitute a continuing nuisance, trespass, and damages," Pre-Trial Order at 4, and demand a variety of relief, including per-acre damages, an injunction, and punitive damages. American Salt denies all liability in a complex and many-faceted argument that will be explicated shortly.

### B. Motion To Review

On May 19, 1982 the plaintiffs moved to supplement their pleadings pursuant to Rule 15(d) of the Federal Rules of Civil Procedure. In connection with this motion, the plaintiffs designated a new expert witness, Curtis Miller. On June 1, 1982, American Salt moved to strike Miller and two other expert witnesses from the plaintiffs' designation of experts. Magistrate Wooley, in a seven-page opinion filed October 20, 1982, construed the plaintiffs' motion as a motion to amend pursuant to Rule 15(a) and, as such, overruled it. The Magistrate also granted American Salt's motion to strike expert Miller, but overruled its motion to strike the other two experts. The plaintiffs have appealed the Magistrate's order to this Court, the eighth time that such an appeal has been perfected during the discovery in this case.

The plaintiffs sought to supplement their pleadings pursuant to Rule 15(d) with allegations that the salt dissolved in the aquifer is rising to the surface by capillary action and threatening to turn the entire area into a desert devoid of all plant life. Magistrate Wooley concluded "that if such capillary action exists at all, it has been occurring for a long period of time prior to the filing of this motion," thus rendering Rule 15(d) inapplicable and transforming the motion into one for an amendment under Rule 15(a).

In determining whether justice required the amendment, Magistrate Wooley considered the feasibility of a separate suit on the capillary action theory, the motive of the plaintiffs in waiting until such a late date to assert the claim, and the glacial pace of the discovery completed up to that time. The Magistrate concluded that a separate suit was feasible, that there was a "distinct probability of improper motives on the part of the plaintiffs," that additional delay of up to two years in the trial of this matter could result, and that allowing the amendment would grant an "undeserved tactical advantage to the plaintiffs" in regard to American Salt's motion for partial summary judgment that is dealt with in the next section of this Opinion. For these reasons, Magistrate Wooley overruled the motion. Finally, because the amendment was not permitted, American Salt's motion to strike expert Miller, whose testimony would have concerned only the capillary action theory, was granted.

It is well-established that the orders of a United States Magistrate must stand unless they are clearly erroneous or contrary to law, 28 U.S.C. § 636(b)(1)(A); *Devore & Sons, Inc. v. Aurora Pacific Cattle Co.,* 560 F.Supp. 236, 239 (D.Kan.1983). Although this Court would have approached these motions from a different conceptual basis had they been presented here in the first instance, the Court is unable to conclude that the *result* reached by the Magistrate is either clearly erroneous or contrary to law. The disputed order must, therefore, be sustained.

■ The short answer to the plaintiffs' motion to amend is that it is fatally defec-

tive in failing to allege any damage resulting from the capillary action. Had the salt actually arrived on the surface and killed the vegetation, a far different case would be presented—and if the salt actually arrives on the surface at some future time, the Court has no doubt that a different case *will* be presented by the individuals damaged by such an arrival. At this point in time, however, justice simply does not require this Court to grant leave to the plaintiffs to amend their complaint in a way that alleges no damage and can lead to no recovery. When and if damage occurs, justice can be served by a separate lawsuit seeking recovery for that damage. Collateral estoppel and res judicata will not impede such a suit, as both Magistrate Wooley and this Court have concluded that the capillary action theory cannot be raised in this proceeding. The plaintiffs' motion to review the Magistrate's order is, therefore, overruled.

### C. Motion for Partial Summary Judgment

#### 1. American Salt's Argument

American Salt provides an analytical framework for its motion for partial summary judgment by dividing the plaintiffs into four distinct classes, as follows:

(a) Plaintiffs who "have sued for damages to property where there is no evidence of any significant pollution to the groundwater and, in some cases, where the groundwater does not even exist in sufficient quantity to support irrigation."

(b) Plaintiffs who "have sued for damages to property [that] admittedly lies outside the area of possible influence of the American Salt Company."

(c) Plaintiffs who "have sued for damages to property [that] they purchased with the knowledge or on the assumption that the groundwater was already polluted with chlorides."

(d) "All of those plaintiffs (or their predecessors in title) who do not fall into one or more of the three categories listed above knew or assumed or could have easily discovered that their groundwater was polluted with chlorides and believed that American Salt was responsible for such pollution more than two years before the date (May 31, 1977) this suit was filed."

Dk. No. 335, at 1. Because this analytical framework appears adequate to deal with the issues raised by American Salt's motion for partial summary judgment, it will generally be used as the organizational framework for this section of this Opinion as well.

#### 2. Preliminary Geography

American Salt's manufacturing plant is located approximately one-half mile southeast of Lyons, Kansas and approximately four miles northwest of Saxman, Kansas. Two miles south of Lyons is Cow Creek, a minor tributary of the Arkansas River, which runs in a generally southeasterly direction. Cow Creek is located above the Cow Creek Valley Aquifer, which is the subject aquifer of this lawsuit and also runs in a southeasterly direction.

American Salt has provided the Court with two handsome multicolor maps, each approximately two by three feet in size and marked as exhibits A and 3, as well as numerous smaller geological maps incorporated into its so-called brief. Exhibit A shows the location of the lands owned or leased by each plaintiff, the boundaries of the Cow Creek Valley Aquifer, and the location of American Salt's properties, and is color coded to correspond to the four categories of plaintiffs established as American Salt's analytical framework. Exhibit 3 shows the extent, location, and severity of the salt pollution of the aquifer. The small illustration maps provide various other details. Reference to these maps has been extremely helpful to the Court, but, as might be expected, their impact is somewhat lessened when the information they contain is translated into words.

An examination of these documents shows that the area of the Cow Creek Val-

ley Aquifer that could possibly be affected by American Salt's operations is somewhat limited. The geological makeup of the area apparently causes Cow Creek to operate as a southern boundary for the spread of groundwater contamination emanating from the location of American Salt's plant. Another natural boundary line exists between one and a half to three miles northeast of Cow Creek, running southeast and essentially paralleling Cow Creek. This northern boundary separates the Cow Creek Valley Aquifer, which contains a large quantity of groundwater, from the Upland Loess Area, which contains a much smaller quantity of groundwater. The area described by these two boundaries is a corridor between one and two miles wide in which most of the plaintiffs' property and most of the saltwater pollution can be found.

### 3. No Significant Pollution or Insufficient Groundwater

This category comprises ten groups of plaintiffs whose properties are situated either partially to the north of the north boundary of the Cow Creek Valley Aquifer or partially or wholly to the south of Cow Creek. Some parts of these properties therefore lie outside the aquifer and the area of salt pollution. American Salt claims that "it is unnecessary to cite any authority in support of the proposition that plaintiffs who have suffered no measurable harm to their groundwater cannot recover damages in this action," Dk. No. 337 at 150. Although the Court is inclined to agree concerning those properties completely outside the aquifer, the argument is specious as applied to those properties that overlie the aquifer even slightly. *Any* access to the aquifer would allow a well to be drilled, bringing the benefits of domestic and irrigation water to the whole tract, regardless of whether the entire tract overlies the aquifer.

Because American Salt has failed to carry its burden of proving beyond a reasonable doubt that it is entitled to summary judgment through a demonstration that no triable issue of material fact exists as to those properties partially overlying the aquifer, *Cayce v. Carter Oil Co.,* 618 F.2d 669, 672 (10th Cir.1980); *Madison v. Deseret Livestock Co.,* 574 F.2d 1027 (10th Cir.1978), its motion for partial summary judgment as to those tracts in category (a) and more precisely detailed on page 2 of Dk. No. 335 must be overruled except for the following tracts that are completely outside the boundaries of the aquifer:

| Owner | Tract |
| --- | --- |
| Wilmor H. Oden | 400 acres in Sections 1 & 2, Township 21 South, Range 8 West of the 6th Principal Meridian. |
| Edris Edwards | 160 acres in Section 26, Township 20 South, Range 8 West of the 6th Principal Meridian. |
| Joleen Ottlinger | 80 acres in Section 31, Township 20 South, Range 7 West of the 6th Principal Meridian. |

Because the property described above belonging to Joleen Ottlinger is the only property belonging to that person involved in this lawsuit, complete summary judgment against Joleen Ottlinger must be entered.

### 4. Outside the Influence of American Salt

This category comprises seven groups of plaintiffs whose properties are located southeast of Saxman, Kansas. The contentions of the parties show no parallelism with regard to these tracts. American Salt appears to claim that an adjacent oil field "which has been in existence for many years and which would be a contributing (if not the original and exclusive) source of any chlorides found in the groundwater in the area" makes proof of causation impossible, Dk. No. 337 at 151. The plaintiffs, on the other hand, appear to be arguing that the leading edge of the heavily polluted groundwater, which moves as the water in the aquifer flows southeasterly at the rate of approximately five feet per day, has not yet reached these properties but is certain to do so in the near future. The plaintiffs thus argue that these landowners "may reduce their future claims for permanent in-

jury to a present claim for monetary damages," Dk. No. 351, Vol. 1, at 41.

■ Part of the difficulty with these properties is traceable to the unwillingness of the plaintiffs' expert witnesses to opine about the source of the salt pollution, if any, currently present in the aquifer in this locale. This unwillingness has resulted in a bizarre straight-line cut-off at the southeastern corner of Exhibit 3, which is the map showing the location and severity of the salt pollution of the aquifer. The Court is, therefore, left with no evidence tending even to suggest that pollution placed in the aquifer by American Salt has reached these properties. The situation is the same as that discussed in section B of this Opinion concerning the capillary action theory: this land may be damaged in the future, but apparently is undamaged now. Because the plaintiffs have failed to present any evidence of presently existing injury, American Salt is entitled to summary judgment as a matter of law because no triable issue of material fact exists, *Ando v. Great Western Sugar Co.*, 475 F.2d 531, 535 (10th Cir. 1973); *American Empire Ins. Co. v. Nugent*, No. 77–1466 (10th Cir., *unpub.*, Jan. 22, 1979), as to the following tracts:

| Owner | Tract |
| --- | --- |
| Robert A. Johannsen | Southeast Quarter of Section 29, Township 20 South, Range 7 West of the 6th Principal Meridian. |
| Harry Zwick | West Half of Section 33, Township 20 South, Range 7 West of the 6th Principal Meridian. |
| Gary Zwick | Southeast Quarter of Section 32, Township 20 South, Range 7 West of the 6th Principal Meridian. |
| Harvey Willhaus | 320 acres in Sections 4 & 5, Township 21 South, Range 7 West of the 6th Principal Meridian; 160 acres in the Northwest Quarter of Section 28, Township 20 South, Range 7 West of the 6th Principal Meridian. |
| Lester Cole | 180 acres in Section 4, Township 21 South, Range 7 West of the 6th Principal Meridian, and in Sections 33 & 34, Township 20 South, Range 7 West of the 6th Principal Meridian. |
| Wilmor Oden | Two lots in the Southeast Quarter of Section 2, Township 21 South, Range 7 West of the 6th Principal Meridian. |
| Jay Brothers | 10 acres in the Northwest Quarter of the Southwest Quarter of Section 29, Township 20 South, Range 7 West of the 6th Principal Meridian; Lots in Saxman, Kansas. |

Because all of the property involved in this lawsuit belonging to Robert Johannsen, Gary Zwick, Harvey Willhaus, and Lester Colle is included in the preceding list, complete summary judgment against those individuals and in favor of American Salt must be entered. This entry of summary judgment is, of course, without prejudice to the right of these individuals to file new lawsuits unencumbered by the doctrines of res judicata and collateral estoppel when, if ever, the leading edge of the pollution in the aquifer crosses their property lines.

### 5. Property Purchased With Knowledge of Pollution

This category comprises six groups of plaintiffs whose properties are located deep within the area of the most severe salt pollution of the aquifer. American Salt relies on two parallel arguments to assert its entitlement to partial summary judgment. First, American Salt argues that these plaintiffs purchased their land with the knowledge that the groundwater was polluted, that the plaintiffs therefore paid a dry land price for the properties, and that the plaintiffs therefore have not been injured by the pollution. Alternatively, American Salt cites the cases of *Roberts v. Pacific Northern Railroad Co.*, 158 U.S. 1, 15 S.Ct. 756, 39 L.Ed. 873 (1895) and *Taylor Investment Co. v. Kansas City Power & Light Co.*, 182 Kan. 511, 322 P.2d 817 (1958) for the proposition that these plaintiffs must suffer an adverse summary judgment because of their failure, at this stage in the litigation, to affirmatively prove that their grantors and predecessors in title specifically assigned a chose in action against American Salt for the aquifer pollution in the deeds to the properties. Neither of these arguments is persuasive.

■ As for the transactions allegedly completed at a dry land price, the plaintiffs correctly point out that the polluted condition of the aquifer is hardly the only possible reason for the transactions to be made at that price. For example, a dry land price

may have been paid because the state of irrigation technology extant at the time of the transaction was simply inadequate to take advantage of *any* water under the property, whether polluted or not, or because the topography of the particular parcel rendered it unsuitable for extant irrigation techniques. If the state of irrigation technology has now improved to the point where the salt pollution is the only factor depressing the land values to dry land price, then these plaintiffs have suffered a compensable injury because of the pollution. This area of contention is, furthermore, rife with material factual disputes, such as the prices actually paid for the land, the prevailing dry land price at the time of the transactions, the exploitability of the groundwater resources at various times, and the knowledge and assumptions of the grantors and grantees.

■ The alternative case law argument founders on legal grounds. Even ignoring the easy distinguishability of *Roberts* and *Taylor,* which both dealt with open, visible, and notorious surface infringements on the right to quiet possession, American Salt has failed to carry its burden of proof because of its erroneous conception of where that burden lies. Although American Salt's statement that the "plaintiffs have the burden of establishing their right to sue by virtue of assignments of choses of action in their deeds," Dk. No. 356 at 17, may be correct in the context of a *trial,* it is clearly erroneous in the context of a summary judgment motion. The burden is on American Salt to prove every element of its entitlement to summary judgment beyond a reasonable doubt, and all inferences must be indulged in favor of the plaintiffs who oppose the motion, *Madison, supra; Frey v. Frankel,* 361 F.2d 437, 442 (10th Cir.1966). Because American Salt has failed to carry this burden, its motion for partial summary judgment as to those plaintiffs in category (c) and their properties, as more precisely detailed on page 5 of Dk. No. 335, must be overruled.

### 6. Plaintiffs Barred by the Two-Year Statute of Limitations

This catch-all category comprises twelve groups of plaintiffs whose properties, like those in the preceding subsection, lie within the zone of the most acutely polluted groundwater. American Salt advances a tripartite argument to support its motion for partial summary judgment against this final category of plaintiffs: (a) the damage to the aquifer wrought by the immense quantity of salt dissolved in it is permanent damage; (b) the plaintiffs in this category knew of the permanent damage more than two years before this suit was filed; and (c) the plaintiffs are therefore barred by the two-year statute of limitations found in K.S.A. § 60–513. The Court has completed a very substantial amount of its own research on this subject to supplement the arguments and analysis provided by the parties, and believes that each part of this tripartite argument deserves individual discussion.

#### a. Salt Damage to the Aquifer as Permanent Damage

A foray into the Kansas case law to determine the significance and validity of this assertion has revealed a rather muddled state of affairs. The Kansas Supreme Court itself, in the case of *McComb v. Stanolind Oil and Gas Co.,* 164 Kan. 1, 186 P.2d 574 (1947), has candidly admitted that "there seems to be some contrariety in the decisions" dealing with when a cause of action for damages to realty accrues, *id.* at 5. It appears to this Court that the contrariety is, in large part, due to the unprincipled and inconsistent use of the terms "temporary" and "permanent" in these cases.

As a preliminary matter, it should be noted that, when realty is damaged by pollution, the terms "temporary" and "permanent" can be applied to three quite distinct facets of the situation. First, the *pollution itself,* or the causal chemistry of the injury to the land, may be either temporary or

permanent. Second, the *damage or loss* caused by the injury may be temporary or permanent. Last, the *source or origin of the pollution,* be it a sewage plant, an oil well, or a salt mine, may be temporary or permanent. The possibilities for inconsistencies are, of course, multiplied when different labels are applied to these facets, such as, for example, calling the source of the pollution a nuisance and then characterizing the nuisance as temporary or permanent. Some of the Kansas cases focus on one of these facets, and some focus on another. In those cases where an explicit "temporary" or "permanent" distinction is drawn, it is determinative of when the cause of action accrued and, consequently, of when the cause of action became barred by the applicable statute of limitations. Because of the wide diversity displayed by these cases, a chronological survey of them is, unfortunately, a necessity, and so such a chronology follows.

### 1. Cases Prior to 1930

In the venerable case of *Kansas Pacific Railway v. Mihlman,* 17 Kan. 224 (1876), the Railroad trespassed on Mihlman's land and constructed a culvert and ditch, partially encroaching on Mihlman's land, that caused flood damage more than two years later. The Kansas Supreme Court concluded that the unlawful nature of the original trespass, actionable in itself, caused the statute of limitations to start running at the time of the trespass, and found Mihlman's suit barred. The Court, in an effort to highlight by contrast, went on to hold that

> where one creates a nuisance, and permits it to remain, so long as it remains it is treated as a continuing wrong, and giving rise, over and over again, to causes of action. But the principle upon which one is charged as a continuing wrongdoer is, that he has a legal right, and is under a legal duty, to terminate the cause of the injury.

*Id.* at 231.

In *McDaniel v. City of Cherryvale,* 91 Kan. 40, 136 P. 899 (1913), the first explicit decision of a temporary/permanent question is found. The City of Cherryvale constructed a sewer system in 1905 that discharged into Drum Creek, a small stream that ran through McDaniel's property. An oil refinery constructed in 1905 also discharged into the creek. Plentiful rains diluted the sewage and prevented McDaniel from noticing any problem. In 1909, a dry spell concentrated the sewage to such an extent that the water was rendered unfit for any purpose. The Kansas Supreme Court held that

> as the sewer system constructed by the city and the refinery constructed by the oil company were *permanent in their nature* and as the flow of the sewage and refuse from them was designed to continue indefinitely in the future a cause of action for *permanent damages* arose when the sewage and other impurities were first emptied into the stream.

*Id.* at 43, 136 P. 899 (emphasis added). The Court refined its perception of the sewer system and refinery as "permanent in their nature" by holding that

> the sewer system and refinery are, in their nature, design, and use permanent structures, *the operation of which will necessarily be injurious to plaintiff's land and must continue permanently to affect and depreciate the· value of his land.*

*Id.* at 46, 136 P. 899 (emphasis added). Because the first dumping had occurred more than two years before McDaniel's suit was filed, he was barred.

### 2. 1930s Cases

Six cases of particular significance were decided in the 1930s, when the production of Kansas petroleum increased substantially. In *Lackey v. Prairie Oil & Gas Co.,* 132 Kan. 754, 297 P. 679 (1931), the single oil well drilled by the defendant in 1925 had been joined by eleven to thirteen new ones whose combined output of waste and refuse injured Lackey's pasture. The Kansas Supreme Court noted that

> the oil wells were *permanent structures, designed to continue indefinitely.* The

conditions under which they were operated were such that the injury was constant as well as progressive.

*Id.* at 757, 297 P. 679 (emphasis added), and that

in this instance the bringing in of the first oil well in 1925 caused injury to plaintiff's land, and the *permanent nature of the injury* was demonstrated more than two years before he sued for damages.

*Id.* at 758, 297 P. 679 (emphasis added). Lackey's suit was, therefore, held to be barred.

In *Berry v. Shell Petroleum Co.*, 140 Kan. 94, 33 P.2d 953 (1934), the question of whether salt pollution of underground water is temporary or permanent injury was argued to the Kansas Supreme Court. At trial, the plaintiff claimed and recovered permanent damages. The jury also expressly found that the groundwater, like the aquifer in this case, had a definite direction of flow. This finding was leapt on by the polluting oil company, which argued that the damage to the plaintiff's groundwater could only be temporary because the natural flow would eventually carry the pollutants away, and that the award of permanent damages should, therefore, be reversed. The Court held that

this Court is not prepared to say that when the substrata has once become saturated with salt from an oil well the water moving through it will cleanse it so that the water in the well will become pure again. The evidence on this point is too vague. We doubt if anyone knows. We think the instructions correctly state the law.

*Id.* at 105, 33 P.2d 953. Despite the contentions of the parties and the obvious precedential weakness of this statement, American Salt has nevertheless cited it as binding authority for the proposition that salt pollution of an aquifer is a permanent injury, Dk. No. 337 at 155.

The next year, contrariety appeared in the case of *Gardenhire v. Sinclair-Prairie Oil Co.*, 141 Kan. 865, 44 P.2d 280 (1935). The facts were somewhat similar to those in *Lackey;* 1926 oil wells that had previously caused some pollution were deepened in 1931 and thereafter caused substantially more pollution. Instead of focusing on the permanent nature of the oil wells themselves, however, the Kansas Supreme Court appears to have focused on the nature of the injury caused by them:

the defendants had no right to pollute a stream or natural watercourse by prescription. Timber Creek and the ravine leading into it were natural watercourses. The pollution of the stream was wrongful and therefore no permanent right can be acquired. "The pollution of the stream being a wrongful act, no permanent right to continue it can be acquired; and, therefore, the damages to be awarded must be merely for the temporary injuries which have occurred to the time of trial or to the time of bringing the action, if, under the local practice, that is the time fixed for the computation of damages to be recovered in the action."

*Id.* at 870, 44 P.2d 280 (citations omitted). The Court went on to examine an instruction given by the trial court to the effect that *any* injury occurring more than two years prior to the filing of the suit and traceable to the pollution would cause the suit to be barred. The Court opined that "the given instruction was more favorable to the defendants than the law warrants," *id.* at 871, 44 P.2d 280.

The next year, in *Fulmer v. Skelly Oil Co.*, 143 Kan. 55, 53 P.2d 825 (1936), the Kansas Supreme Court explicitly recognized that

there is a confusion involved in the discussion of the law of the case as to the damages being permanent or temporary, and also as to the liability for damages for pollution being dated from the permanent structure of the plants, which by common knowledge may be positively expected to cause pollution and damage, or from the date of the first serious injury from pollution.

*Id.* at 56, 53 P.2d 825. The Court labeled the injury as permanent because the plaintiff had asked only for permanent damages, *id.* at 57, 53 P.2d 825, performed a survey of prior cases to determine when the permanent damage began, *id.* at 59–61, 53 P.2d 825, and held that the plaintiff's cause of action accrued when the stream was first polluted in 1917, and not when a drought caused the pollution to become so concentrated for the first time as to prevent the plaintiff's cattle from drinking it and thereby substantially injure the plaintiff.

An entirely new field of potential confusion was introduced by *Jeakins v. City of ElDorado,* 143 Kan. 206, 53 P.2d 798 (1936). As in *McDaniel, supra,* the plaintiffs in *Jeakins* were injured by the operation of a municipal sewer system. Two distinct claims were made: one for a decrease in the value of the plaintiffs' land and a second for psychological and health injuries to the plaintiffs. The Court construed the first of these claims to be one for permanent damages, and the second to be one for temporary damages, *id.* at 210, 53 P.2d 798. *McDaniel* was then cited for the proposition that the sewer system, as a permanent structure whose "operation was necessarily a constant and continuous use," created a cause of action for permanent damages when the sewage was first placed in the stream, *Jeakins,* 143 Kan. at 210, 53 P.2d 798. Although this holding barred the claim for permanent damages, the Court nevertheless allowed the plaintiffs to proceed on their claim for temporary damages, apparently because the negligent operation of the sewer system by the city made that system a *nuisance.*

This new distinction was picked up by *Seglem v. Skelly Oil Co.,* 145 Kan. 216, 65 P.2d 553 (1937), where the Kansas Supreme Court, in a holding very similar to that in *Fulmer,* took special care to point out "that this was an action for permanent damages to the farm, not for recurring damages, *nor for the abatement of a recurring or continuing nuisance,*" *Seglem,* 145 Kan. at 221, 65 P.2d 553 (emphasis added). No attempt is made, however, to explain why the negligent operation of a sewer system leading to pollution creates a continuing nuisance, while the negligent operation of an oil field leading to pollution does not.

### 3. 1940s Cases

Four cases of significance to the present inquiry were handed down by the Kansas Supreme Court in the 1940s. The first, *Donley v. Amerada Petroleum Corp.,* 152 Kan. 518, 106 P.2d 652 (1940), involved the now-familiar pollution of surface waters by an oil company. With nary a word written about the nature of the oil wells as permanent structures, the Court affirmed a judgment in favor of the plaintiffs, including both actual and punitive damages, based on a theory of temporary damage to a stock farm. The plaintiffs apparently made a simple election to sue for temporary instead of permanent damages, phrased their measure of recovery in the decreased rental value of the farm after the pollution, and sought that level of recovery for the two years preceding their filing of suit. The Court voiced no quarrel with this procedure.

The next year, in *Eyman v. National Union Oil & Gas Co.,* 153 Kan. 45, 109 P.2d 477 (1941), the Kansas Supreme Court demonstrated an unwillingness to perform a *Donley*-type analysis when *all* of the items of claimed damage had occurred more than two years before suit had been brought. The petition alleged permanent damages to the premises, including the destruction of trees, but made clear that all of these damages were complete more than two years before. The plaintiff's argument that the oil wells constituted an abatable nuisance did not carry the day, but the Court simply ignored the nuisance component of the argument and focused on the permanent nature of the damage already done, *Eyman,* 153 Kan. at 47–48, 109 P.2d 477.

*Peterson v. Texas Co.,* 163 Kan. 671, 186 P.2d 259 (1947), is yet another case of saltwater pollution from an oil field causing

damage to an adjacent farming operation. Instead of the more usual surface pollution, however, this case dealt with salt pollution of the fresh-water strata beneath the plaintiff's farm. The plaintiff phrased his petition in terms of temporary damages, even though the temporary nature of the death of heifers, chickens, and large tracts of prairie grass is open to some dispute, and elected to sue to recover these temporary damages on a bi-annual basis. The reported case is, in fact, the second one brought by the plaintiff against the oil company. The Court stated that

> there can be no doubt but that plaintiff did have knowledge as early as 1941 that oil-field refuse from defendant's wells was flowing onto his farm in substantial amount,

id. at 677–78, 186 P.2d 259, but then went on to distinguish *McDaniel, Lackey, Fulmer,* and *Eyman* solely on the basis that those cases were for permanent damages. The judgment below in favor of the plaintiff was affirmed.

### 4. Cases After 1950

As previously mentioned, it was the 1947 *McComb* case that first took explicit notice of the contrariety in the Kansas cases. Cases after 1950 concerning the time of accrual of a cause of action and the temporary/permanent question take frequent notice of the conflict. *See, e.g., Henderson v. Talbott,* 175 Kan. 615, 266 P.2d 273 (1954) ("The question when a cause of action for damages because of overflow of land accrues is one beset with difficulties, on which the authorities are in great conflict and exhibit considerable confusion. This is true even in our own jurisdiction where it must be admitted there is some contrariety in our own decisions," id. at 620, 266 P.2d 273); *Gowing v. McCandless,* 219 Kan. 140, 547 P.2d 338 (1976) ("The [statute of limitations question] involved on this appeal is one normally encountered where damages occur when water overflows agricultural land. On this general subject our decisions are

conflicting," id. at 143–44, 547 P.2d 338); *Dougan v. Rossville Drainage District,* 2 Kan.App.2d 125, 575 P.2d 1316 (1978) ("The question of when a cause of action accrues as a result of a party causing another's land to be flooded has been extensively litigated in Kansas. Not all of the Kansas authority is in harmony," id. at 127, 575 P.2d 1316). As the quotations indicate, these cases deal with the flooding of one person's land because of another person's acts. The legal analysis as to the time of accrual of the cause of action, the significance of the temporary/permanent distinction, and the explication of nuisance doctrine performed by these recent cases, however, is fully applicable and very helpful to the present inquiry.

In *Henderson,* the defendant had constructed a dam on his property that backed up water on the plaintiff's property. The trial court ruled that the plaintiff could recover for all injuries accruing within two years of the filing of the suit, and the jury returned a verdict favorable to the plaintiff. The Kansas Supreme Court quoted the following passage from 56 Am.Jur. *Waters,* §§ 45, 443 (now 78 Am.Jur.2d *Waters,* §§ 35, 39, 122, 123, 128, and 367):

> In actions by riparian owners for damages for interference with the flow of a stream, the scope of recovery is usually held to depend on whether the injury is permanent or continuing. The weight of authority is to the effect that whenever the structure or obstruction impeding the flow of water is of a permanent character, and its construction and continuance are necessarily an injury, the damage is considered original, to be recovered in one action, and not continuous in character, and the statute of limitations begins to run from the completion of the obstruction, or at least from the time of the first injury. But when the construction and continuance of the structure are not necessarily injurious, but may or may not be so, the injury to be compensated in a suit is only the damage which has happened; and there may be as many successive

recoveries as there are successive injuries. In such cases the statute of limitations begins to run from the happening of the injury complained of.

. . . .

The determination of the question whether the flooding of land gives rise to a single right or successive rights of action depends ordinarily upon whether the injury or the causative condition is permanent or temporary. The rule prevailing in most jurisdictions is that if the injury is permanent, or if the causative structure or condition is of such a character that injury will inevitably result and the amount of damage can be determined or estimated, a single action may and should be brought for the entire damages, both past and prospective. But if the overflow is merely temporary, occasional, or recurrent, causing no permanent injury to the land, or if the situation involves other elements of uncertainty, such as the possibility or likelihood of the alteration or abatement of the causative conditions, or uncertainty in regard to the future use or improvement of the land, so as to prevent a reasonably accurate estimate of future damages, it is generally held that each reptition (repetition) of the overflow gives rise to a new cause of action for which successive actions may be brought.

*Henderson,* 175 Kan. at 621, 266 P.2d 273. This language was then supplemented by the quotation from the *Mihlman* case concerning nuisance and previously set about above, *supra* p. 900, and a quotation from *McDaniel* indicating that the plaintiffs in that case *"could have elected* to have sued for temporary damages sustained within the statutory period preceding the bringing of the action," *Henderson,* 175 Kan. at 623, 266 P.2d 273 (quoting *McDaniel,* 91 Kan. at 43, 136 P. 899) (emphasis added). This authority was sufficient to cause the Court to affirm the plaintiff's judgment. Of particular significance to the present inquiry is the following language, found at the end of the statute of limitations discussion:

In reaching the conclusion just announced we have not attempted to distinguish and are not disposed to labor the divers cases cited by appellant in support of his position. It suffices to say that some of them can be distinguished because the structure involved was located on the land of the person seeking to recover damages; some are distinguishable because the action was to recover for permanent injuries to the real estate in question; others are not comparable for the reason, that exactly contrary to the situation in the case at bar, the nuisance created by the structure in question was not abatable and the injuries resulting therefrom were continuous and permanent; and still others are not in point because of wholly dissimilar factual situations. And it should be added that *if there is language in any of such decisions indicating views contrary to those herein expressed under prevailing conditions and circumstances it is no longer entitled to weight and should be disregarded.*

*Henderson,* 175 Kan. at 624, 266 P.2d 273 (emphasis added).

The notion that plaintiffs enjoy an election as to whether to pursue temporary or permanent damages was reinforced in the case of *Augustine v. Hinnen,* 201 Kan. 710, 443 P.2d 354 (1968). The plaintiffs there sought actual and punitive damages for saltwater pollution of their fresh water wells by the defendant oil leasehold owners and operators. The pollution had begun nine years before the suit was filed at the earliest, and five years before at the latest. In its recital of the facts, the Kansas Supreme Court stated that "at the pretrial hearing plaintiffs elected to pursue their case on the theory of temporary damages for the two-year period beginning in the fall of 1962," *id.* at 711, 443 P.2d 354. Although the opinion leaves something to be desired in terms of clarity, it appears that the jury found that the defendants had allowed the escape of deleterious substances within two years of the filing of the suit

and that the jury awarded actual and punitive damages. The verdict for actual damages was affirmed.

In *Gowing v. McCandless,* 219 Kan. 140, 547 P.2d 338 (1976), upper landowners sought actual and punitive damages from a lower landowner whose obstruction of a watercourse seven years before suit was filed had caused damage to the plaintiffs' crops in later years by backing up water over the plaintiffs' fields. The Kansas Supreme Court noted that the plaintiffs had elected to seek temporary damages and then focused on the nature of the *obstruction:*

> In the instant case the evidence does not show the cause of the injury to be permanent. In many cases injuries have been classified as temporary or recurring in nature when caused by an abatable nuisance or condition, or by defects which can be repaired or remedied at reasonable expense. Successive injuries of this nature have been held to give rise to separate and distinct causes of action.

*Id.* at 145, 547 P.2d 338. The judgment for the plaintiff was affirmed.

This general trend was followed in the recent case of *Bowen v. City of Kansas City,* 231 Kan. 450, 646 P.2d 484 (1982), where the plaintiffs sought to recover damages for flooding resulting from the defendant's creation and maintenance of a nuisance. The Kansas Supreme Court stated that

> Plaintiffs rely upon our decisions which state that where there is a nuisance which is a temporary condition that is abatable, a new cause of action arises each time damage occurs. This is undoubtedly the law insofar as a person who *maintains* an abatable nuisance is concerned. This court has considered numerous cases where periodic flooding resulted from the acts of another and we have held that the statute of limitations begins to run at the time each loss resulting from the maintenance of the nuisance occurs and not from the time the nuisance was first created. *Gowing* ....
> However, the rule of *Gowing* and its predecessors is predicated upon the defendant's ability and duty to abate the existing conditions which constitute the nuisance.

*Bowen,* 231 Kan. at 454, 646 P.2d 484 (emphasis in original).

The final case to be considered in this section of this Opinion is *McAlister v. Atlantic Richfield Co.,* 233 Kan. 252, 662 P.2d 1203 (1983), in which the plaintiff was seeking the recovery of damages caused by alleged violations of the Oil Well Pollution Act, K.S.A. § 55–121. The plaintiff filed case number 54,357 some seven years after his well water became undrinkable, naming as defendants two oil companies that had last conducted operations in the area in the 1930s and 1940s. The plaintiff also alleged "that not less than 150 nor more than 400 years will pass before the well water will be once again fit for drinking," 662 P.2d at 1212. Justice Lockett held the claim to be barred by the two-year statute of limitations after making the following statements on the temporary/permanent question:

> Temporary damages or continuing damages limit recovery for injury that is intermittent and occasional and the cause of the damages remediable, removable, or abatable. Damages are awarded on the theory that [the] cause of the injury may and will be terminated. Temporary damages are defined as damages to real estate which are recoverable from time to time as they occur from injury. 25 C.J.S. *Damages,* § 2, p. 626. Permanent damages are given on the theory that the cause of injury is fixed and that the property will always remain subject to that injury. Permanent damages are damages for the entire injury done—past, present, and prospective—and generally speaking those which are practically irremediable. 25 C.J.S. *Damages,* § 2, pp. 622–23. If an injury is permanent in character, all the damages caused thereby, whether past, present, or prospective, must be recovered in a single action.

662 P.2d at 1211.

### 5. *Proper Doctrinal Course For This Case*

The proper approach to sorting out the preceding precedents and setting a course

for this litigation to follow was suggested by the Kansas Supreme Court in *Gowing.* In a decision that has come to appear increasingly wise to this Court, that Court summarily decided that

> No attempt will be made in this opinion to venture into the thicket of Kansas cases beginning from statehood. Our recent cases establish a trend in the law which controls our decision herein.

*Gowing,* 219 Kan. at 144, 547 P.2d 338. The first principle that will be relied on, therefore, is that the recent trends in Kansas law should be given relatively greater regard than the trends expressed in the cases that are now between fifty and one hundred years old.

A second bit of guidance comes from the oft-repeated assertion of the Kansas courts that

> it is to be borne in mind that each [prior] decision has been rendered upon the particular facts of that case, and when that is borne in mind some of the difficulty disappears.

*McComb,* 164 Kan. at 5–6, 186 P.2d 574. *See also Dougan,* 2 Kan.App.2d at 127, 575 P.2d 1316 ("Obviously, each case must be decided on its own facts, giving due regard to established law."). The second principle, therefore, is that those elements of this case that present a case of first impression in this jurisdiction and that serve to distinguish this case from the cases discussed above—such as the pollution originating from a solution salt mining operation, the egregiousness of the pollution in this case, the large area and number of people affected, and the continuous nature of the enterprise (and perhaps the pollution itself) over such a protracted period—are entitled to full weight and consideration.

The third principle is that the dynamic and evolving nature of tort law must be accorded its proper significance. In 1931, the Kansas Supreme Court, in the *Lackey* opinion, discounted a prior case with the statement that "the opinion was written nearly fifty years ago, and the writer of the opinion did not have the benefit of the searching analysis of tort liability which has been made in recent years," *Lackey,* 132 Kan. at 758, 297 P. 679. Of course, the same criticism can now be made of *Lackey* itself, which is presently fifty-two years of age.

A fourth principle can be derived from the indeterminate overruling of prior inconsistent cases accomplished in 1954 in the *Henderson* opinion. Although the scope of this overruling and the exact cases affected are uncertain to some degree, the existence of such language in the opinion is sufficient to case doubt on the validity of some of the harsher cases that preceded *Henderson.*

■ With these four principles firmly in mind, an examination of the cases surveyed in the preceding subsection of this Opinion convinces this Court that the Kansas Supreme Court, if presented with American Salt's statute of limitations argument, would find that argument unpersuasive. The recent trend in the Kansas cases, traceable to *Mihlman, Gardenhire,* and *Jeakins* and most recently affirmed in *Gowing* and *Bowen* is to consider the damage resulting from an abatable nuisance that causes pollution to be temporary damage, giving rise over and over again to causes of action to recover for the injuries sustained in the statutory period immediately preceding the filing of the suit, at least so long as some acts of pollution continue. Several auxiliary points strongly support this conclusion.

First among these auxiliary points is the dispute between the plaintiffs and American Salt as to whether pollution is continuing. American Salt, as might be expected, asserts that its plant has caused no significant pollution since 1965, *see, e.g.,* Dk. No. 356 at 73, No. 2. If one indulges the assumption that the salt now polluting the aquifer originally escaped from American Salt's control, and further indulges the assumption that American Salt's statement that no pollution is now occurring is true, then American Salt has, in essence, admit-

ted to abating a polluting nuisance. Certainly American Salt would be hard-pressed to argue that its plant is a "permanent structure, the operation of which will necessarily be injurious to plaintiffs' land," *McDaniel,* 91 Kan. at 46, 136 P. 899, inasmuch as such an argument would be tantamount to an admission that the plant is still polluting, and uncontrollably so at that. The salt plant is not designed to pollute the aquifer, and should not do so in the absence of negligence. If the plant does pollute the aquifer, it does so because of "defects which may be repaired or remedied," *Gowing,* 219 Kan. at 145, 547 P.2d 338. The polluting plant would, therefore, constitute an abatable nuisance that would support an endless series of separate and independent actions, at least until all pollution was halted and the nuisance thereby abated, *id.* Because the cause of the injury—the loss of salt into the aquifer—is not fixed, an award of temporary damages "on the theory that [the] cause of the injury may and will be terminated," *McAlister,* 662 P.2d at 1211, is clearly appropriate.

The second auxiliary point is closely related to the first, and centers on an apparently admitted occurrence of aquifer pollution in 1979. The plaintiffs have alleged that one of the old brine wells was discovered to be communicating with both the aquifer and the high-pressure solution mining field in November of 1979, but that the shutdown of the solution mining field required to repair this defect was not undertaken until the losses of brine from the solution mining operation became so acute as to interfere with the desired production levels at the plant. *See* Dk. No. 351, Vol. 1 at 27–28; Vol. 2, App. 3 at 53–56. American Salt has cavalierly responded to this serious charge with the statement that the paragraph "is the *only* paragraph in the plaintiffs' *entire* summary which contains *any* evidence that *one* of the brine wells *may* have caused *some* pollution for a short period of time," Dk. No. 356 at 62 (emphasis in original). The reason for such aloofness should be apparent. Were American Salt's statute of

limitations argument accepted by this Court, American Salt would be absolutely immune from *any* damage claim by *any* of the present plaintiffs in perpetuity, even if those claims were based on recent or future wrongful acts of pollution that were part of a pattern of continuing or escalating pollution. Accepting the statute of limitations argument would be the functional equivalent of granting American Salt a license to pollute as appears profitable or expedient to American Salt at any particular time, a result clearly in conflict with the previously quoted language from the *Gardenhire* case to the effect that "the pollution . . . being a wrongful act, no permanent right to continue it can be acquired," *Gardenhire,* 141 Kan. at 870, 44 P.2d 280. Of course, these anserous results of American Salt's argument are nowhere mentioned in its documents. This Court's conscience would be shocked by the insulation of a continuing wrongdoer from liability for his wrongful acts.

The third auxiliary point involves the rapid change in attitudes towards pollution of the natural environment witnessed in the last two decades. Justice Smith's observation that "the water supply of the people is of greater importance than the operation of a business at reduced cost," *Berry,* 140 Kan. at 102, 33 P.2d 953, has been vindicated by state statutes that prohibit the pollution of surface and subsurface waters by, among others, operators of salt water injection wells, K.S.A. § 65–171d, and that expressly declare each day of polluting activity to be a separate offense, K.S.A. § 65–171f. The Kansas Legislature has expressed a clear intention to heavily discourage the pollution of the state's water resources, and this Court is loath to thwart this goal with broad and ill-defined grants of immunity to continuing polluters for both past and future acts of pollution.

Last, it should not be forgotten what the plaintiffs have pleaded. Rather than claiming permanent damages for permanent injuries resulting from a permanent structure constituting a permanent nuisance, the

plaintiffs have alleged "a continuing nuisance, trespass, and damages," Pre-Trial Order, Dk. No. 309, at 4. This Court can only construe such language as reflecting an election by the present plaintiffs to pursue the remedy of temporary damages.

The Court has, on its own initiative, done some cursory research on the question of how these temporary damages should be measured. Even a brief examination of the Kansas cases on this issue shows them to be suffering from the imprecise and unpredictable use of "temporary" and "permanent," see, e.g., Adams v. City of Arkansas City, 188 Kan. 391, 362 P.2d 829 (1961); Alexander v. City of Arkansas City, 193 Kan. 575, 396 P.2d 311 (1964). This already overburdened opinion cannot support an analysis of this question: the issue shall be saved for another day.

It may be remembered by the now-fatigued reader that this subsection deals with the first part of American Salt's tripartite argument in support of its statute of limitations argument, namely, whether salt pollution of the aquifer is permanent damage. See supra p. 14. The preceding discussion and analysis compels this Court to conclude that the plaintiffs' allegations are sufficient to categorize the American Salt operation as a continuing nuisance if it is responsible for the pollution now present in the aquifer; that the nuisance represented by the operation is abatable because the defects, if any, causing pollution may be repaired or remedied; and that the injury suffered by the plaintiffs because of American Salt's continuing pollution, if any, is temporary in nature. See generally City of Harrisonville v. Dickey Clay Mfg. Co., 289 U.S. 334, 340–41, 53 S.Ct. 602, 604–05, 77 L.Ed. 1208 (1933); Hilton v. Duke Power Co., 254 F.2d 118, 122 (4th Cir.1958); Conestee Mills v. City of Greenville, 160 S.C. 10, 158 S.E. 113 (1931).

### b. Notice of Damage More Than Two Years Ago

Although the holding in the previous subsection tends to make American Salt's argu-

ment concerning notice irrelevant, the section of American Salt's brief devoted to this argument is so remarkable that it nevertheless deserves some comment. American Salt prefaces the argument with the statement that

> for the purposes of this Memorandum and the Motion [that] it supports, it is assumed that the American Salt Company caused the pollution [that] now exists in all the groundwater "downstream" from the plant—the entire area [that] could have possibly been influenced by the activities of the company since its inception in approximately 1908. Thus, the issue of causation is not addressed herein.

Dk. No. 337, at 1–2. American Salt then follows this disclaimer with a detailed recital, comprising nearly one hundred and fifty pages, of the convincing evidence that American Salt's operations are directly responsible for the salt presently dissolved in the aquifer. This recital covers the entire period of the facility's existence and is exceptionally detailed for the period since 1933.

In order to support the argument that the present plaintiffs knew of the salt pollution damage to the aquifer more than two years before this suit was filed, American Salt was compelled to demonstrate both that the level of pollution was severe and that American Salt was discoverable as the cause of the pollution. The documentary and deposition evidence assembled by American Salt on these points is, to say the least, very persuasive, and should serve to save time at the trial of this matter.

Additionally, this Court notes that the impressive quantity of evidence dredged up by American Salt tends, by its very completeness, to remove this case from the class of cases that statutes of limitations were originally designed to control. The conceptual basis for statutes of limitations has often been explained. The United States Supreme Court has written that statutes of limitations

> are designed to promote justice by preventing surprises through the revival of

claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.

*Order of Railroad Telegraphers v. Railway Express Agency, Inc.,* 321 U.S. 342, 348–49, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944). Likewise, the Rhode Island Supreme Court has written that

statutes of limitations were intended to prevent the unexpected enforcement of stale claims concerning which persons have been thrown off their guard for want of seasonable prosecution .... They afford parties needed protection against the necessity of defending claims [that], because of their antiquity, would place the defendant at a grave disadvantage. In such cases how resolutely unfair it would be to award one who has willfully or carelessly slept on this legal rights an opportunity to enforce an unfresh claim against a party who is left to shield himself from liability with nothing more than tattered or faded memories, misplaced or discarded records, and missing or deceased witnesses.

*Wilkinson v. Harrington,* 104 R.I. 224, 243 A.2d 745 (1968). Although this Court would never ignore a clear statute of limitations bar solely because the defendant appeared ready and able to defend himself, the existence of clear memories, cited records, and deposed witnesses is certainly a factor to weigh in the balance in a case such as this.

c. *The Plaintiffs Are Barred by K.S.A. § 60–513*

K.S.A. § 60–513 provides, in pertinent part, that

(a) The following actions shall be brought within two years:

. . . .

(4) an action for injury to the rights of another, not arising on contract, and not herein enumerated.

(b) ... the cause of action in this action [section] shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury ....

Because this Court has concluded that the plaintiffs' allegations in this case entitle them to attempt to show at trial that the American Salt facility constitutes an abatable nuisance causing temporary damages through salt pollution of the aquifer, the assertion that K.S.A. § 60–513 bars the plaintiffs' claims in their entirety is without merit. This does not mean, however, that the section is irrelevant to this case. K.S.A. § 60–513 does operate to preclude the plaintiffs from recovering for injuries sustained more than two years prior to May 31, 1977, the day this suit was filed. American Salt's motion for partial summary judgment must therefore be overruled in all particulars not expressly granted above, and the plaintiffs are entitled to attempt to prove and recover their damages that have accrued between May 31, 1975 and the date of judgment in this case.

IT IS THEREFORE ORDERED that the plaintiffs' motion for review of the Magistrate's order filed October 20, 1982 is overruled.

IT IS FURTHER ORDERED that the defendants' motion for partial summary judgment is sustained as to plaintiffs Joleen Ottlinger, Robert Johannsen, Gary Zwick, Harvey Willhaus, and Lester Colle.

IT IS FURTHER ORDERED that the defendants' motion for partial summary judgment is sustained as to the individual parcels of land listed below:

| Owner | Tract |
| --- | --- |
| Wilmor H. Oden | 400 acres in Sections 1 & 2, Township 21 South, Range 8 West of the 6th Principal Meridian; 2 lots in the Southeast Quarter of Section 2, Township 21 South, Range 7 West of the 6th Principal Meridian. |
| Edris Edwards | 160 acres in Section 26, Township 20 South, Range 8 West of the 6th Principal Meridian. |
| Harry Zwick | West Half of Section 33, Township 20 South, Range 7 West of the 6th Principal Meridian. |
| Jay Brothers | 10 acres in the Northwest Quarter of the Southwest Quarter of Section 29, Township 20 South, Range 7 West of the 6th Principal Meridian; Lots in Saxman, Kansas. |

IT IS FURTHER ORDERED that the defendants' motion for partial summary judgment is denied in all respects not sustained above.

IT IS FURTHER ORDERED that the Clerk of this Court notify the parties to this lawsuit that, as one of the Court's oldest cases, it will be set down on the trial docket at the earliest possible date after August 1, 1983 that the availability of courtroom facilities and the Court's commitments make feasible.